United States Courts
Southern District of Texas
FILED

*September 17, 2020*

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br> **v.**<br><br> **ZHENGDONG CHENG,**<br>  **Defendant.** | **CRIMINAL NO.:**<br><br> **4:20-cr-455** |

## INDICTMENT

**THE GRAND JURY CHARGES THAT:**

### INTRODUCTION

At all times relevant to this Indictment unless otherwise indicated:

1.      National Aeronautics and Space Administration ("NASA") was a part of the executive branch of the United States government.  NASA regularly partnered with U.S. companies and academic institutions to facilitate the development of new technologies to help meet NASA's technology needs.

2.      In 2011, Congress passed The Department of Defense and Full-Year Appropriations Act, Public Law 112-10 and the Consolidated and Further Continuing Appropriations Act of 2012, Public Law 112-55.  Under these Acts, NASA was prohibited from using appropriated funding to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company ("NASA's China Funding Restriction").

3.      NASA defined "China or any Chinese-owned company" to include Chinese universities because Chinese universities are considered to be incorporated under the laws of the People's Republic of China ("PRC").

*The Defendant and His Employment with the Texas A&M University*

4.      Defendant Zengdong Cheng ("Cheng") was a Full Professor in the Department of Chemical Engineering at Texas A&M University ("TAMU").  TAMU hired Cheng in May 2004. As a faculty member at TAMU, Cheng owed a duty of loyalty and candor to TAMU at all times. Cheng performed research under grants funded by United States Government agencies including NASA.

5.       Beginning at least as early as 2012 and continuing through at least 2018, Cheng was also the Director of the Soft Matter Institute of Guangdong University of Technology ("GDUT") in Guangdong, China.   Cheng was employed as a Guangdong Province Chair Professor, GUDT; term of employment was September 1, 2011, to August 31, 2014.  Cheng was further employed as a "special hire" at GDUT from on or about September 1, 2011, to present. GDUT's leadership includes various Chinese Communist Party ("CCP") Secretaries, such as "Party Secretary" and "Secretary of the Commission for Discipline Inspection".  GDUT was approved by the State Education Commission, located in China, in June 1995.

6.      Additionally, Cheng participated in the PRC's Hundred Talents Plan and the River Talent Plan ("PRTP"), and applied to participate in the Thousand Talents Plan ("TTP") (collectively, "the Chinese Talent Plans").  The Chinese Talent Plans are programs established by the Chinese government to recruit individuals with access to or knowledge of foreign technology or intellectual property. Through these plans the Chinese government has created a significant financial incentive for foreign, talented individuals to transfer international technology and intellectual property to China, licitly or otherwise.

7.      In 2014, Cheng jointly formed Foshan City Ge Wei Technology Company, Ltd, an innovation-oriented enterprise affiliated with GDUT and located at the Numerical Control

Equipment Cooperative Innovation Institute of GDUT in Nan Hai District, Foshan City, China. Cheng and the founding members owned 90% of the company's shares, and the company was dedicated to the design, preparation, and application of microfluidic chips.  As of January 2019, Cheng was still an owner and had held various positions such as Academic Lead and Technical Advisor to Foshan City Ge Wei Technology Co.

8.      From in or about December 1, 2017, to August 31, 2018, Cheng was also a paid as a Visiting Professor at the Academy for Advanced Interdisciplinary Studies at Southern University of Science and Technology ("SUSTech") in Nanshan District, Shenzhen, Guangdong, China, and a Thousand Talent applicant at China University of Science and Technology in Hefei, Anhui Providence, China.  In or about November 2017, Cheng signed an offer letter with SUSTech. The appointment was effective from on or about December 1, 2017 through August 31, 2018, and required Cheng to teach one senior undergraduate and/or one graduate course.  The appointment also required Cheng to assume other teaching, tutoring, and service duties as deemed necessary by SUSTech.  The offer letter was additionally signed by Dr. Shiyi Chen, President of SUSTech.  Cheng's offer letter stated that Cheng would receive a monthly pre-tax salary of 50,000 RMB; a pre-tax 10,000 RMB housing allowance;  and 3,000 RMB traveling allowance per month. The offer letter further indicated that Cheng would receive a research fund of 100,000 RMB towards his research operation every three months.  Travel records reflect that Cheng spent approximately 133 days outside of the United States between December 1, 2017 and August 31, 2018.

9.      Cheng was part of a research team that applied for, and ultimately received, a $746,967 grant to conduct research for NASA.  NASA regulations for the grant Cheng's team applied for prohibited recipients from participating, collaborating, or coordinating bilaterally

3

with China, any Chinese-owned company, or any Chinese university, at the prime recipient level or at any sub-recipient level, whether the bilateral involvement was funded or performed under a no-exchange of funds arrangement.

10.     TAMU has a policy requiring employees to disclose conflicts of interest.  The policy requires, in part, that members "have a responsibility to identify and manage, reduce or eliminate conflicts of interest that may arise due to financial or other personal interests of an Investigator."  With respect to University employees engaged in research, the policy requires that such employees identify, "all Research or Research Activities in which the Investigator is engaged at the time the Financial Disclosure Statement is submitted."

11.     As part of its reporting requirements, TAMU requires its faculty and staff to submit a Financial Disclosure Statement upon initiation of employment and at least annually thereafter.  The form requires TAMU employees to disclose conflicts of interest with respect to outside employment and significant financial interests.  Submission of the online form requires the employee to certify "the information provided is true and correct to the best of my knowledge.  I further certify that I have read System Regulation 15.01.03 Financial Conflict of Interest in Research and the applicable system member rule and that I am aware of and understand my responsibilities and applicable federal regulations and system policies regarding disclosure of Significant Financial Interests."

12.     From at least 2012 to present, Cheng never disclosed to TAMU his financial conflicts of interest and research with the above-described Chinese entities.

THE SCHEME TO DEFRAUD NASA

13.     Beginning in 2013, Cheng engaged in a scheme to defraud NASA by falsely representing and concealing his affiliations with GDUT and other Chinese entities to TAMU.  It

was an object and result of Cheng's scheme to personally enrich Cheng by approximately $86,876 (as of October 2019) in NASA grant funds. Cheng did so by submitting false or misleading affirmations to TAMU in the preparation of the grant application and through multiple affirmations thereafter. Specifically, during the application process, and then later throughout the performance of the NASA grant, Cheng concealed that he was: 1) the Director of the Soft Matter Institute of GDUT, from in or about 2012 through at least 2018; 2) employed as a "special hire" at GDUT from on or about September 1, 2011, to present; 3) employed as a "Chair Professor" at GDUT from on or about September 1, 2011, to August 31, 2014; 4) jointly formed Foshan City Ge Wei Technology Company, Ltd. (China) in or about 2014; 5) a paid Visiting Professor at the Academy for Advanced Interdisciplinary Studies at Southern University of Science and Technology (China) from in or about December 2017 to in or about August 2018; 6) a Hundred Talents Plan member at GDUT; and 7) a TTP applicant at China University of Science and Technology in or about June 2018. Cheng's fraudulent representations and omissions to TAMU about his affiliations caused TAMU to falsely certify to NASA that TAMU was in compliance with NASA's China Funding Restriction regarding a NASA-funded project that TAMU sought and obtained on Cheng's behalf. Had Cheng fully disclosed to TAMU his affiliations with GDUT and other Chinese entities, TAMU would not have certified to NASA that TAMU was in compliance with NASA's China Funding Restriction, and NASA would not have awarded NASA-funded projects to Cheng.

*Relevant Grant Restrictions*

14.     Cheng's research team at TAMU applied for NASA Grant NNX13AQ60G (the Grant) in or about April 2013. The Grant was subject to 14 C.F.R. 1260, Restrictions on Funding Activities with China. 14 C.F.R. 1260 provided:

a.       Pursuant to The Department of Defense and Full-Year Appropriation Act, Public Law 112-55, Section 539; and future-year appropriations (hereinafter, "the Acts"), NASA is restricted from using funds appropriated in the Acts to enter into or fund any grant or cooperative agreement of any kind to participate, collaborate, or coordinate bilaterally with China or any Chinese-owned company, at the prime recipient level or at any sub recipient level, whether the bilateral involvement is funded or performed under a no-exchange of funds arrangement.

b.       "China or Chinese-owned Company" means the People's Republic of China, any company owned by the People's Republic of China, or any company incorporated under the law of the People's Republic of China. According to guidance published by NASA and circulated to grant applicants, "Chinese universities and other similar institutions are considered to be incorporated under the laws of the PRC and, therefore, the funding restrictions apply to grants and cooperative agreements that include bilateral participation, collaboration, or coordination with Chinese universities."

c.       The restriction in Acts do not apply to commercial items of supply needed to perform a grant or cooperative agreement.

d.       Sub award- The recipient shall include the substance of this provision in all subawards made hereunder. The NASA restrictions, according to NASA guidance, do "not restrict individual involvement based on citizenship or nationality. Rather, individuals are subject to the restriction if they are affiliated with institutions of the People's Republic of China or Chinese-owned companies incorporated under the laws of China. Thus, a team member who is a Chinese citizen may work on a NASA project, but

6

an individual affiliated with an institution of the Chinese would be subject to the statutory restriction."

*NASA Grant Application and Administration*

15.     During TAMU's application process for the Grant and thereafter, Cheng served as the Principal Investigator ("PI") for the Texas A&M Engineering Experiment Station ("TEES"). Cheng was described as the PI in TAMU's application for the Grant, "Title: Research Opportunities in Complex Fluids and Macromolecular Biophysics, Liquid Crystals of Nanoplates." TAMU was ultimately awarded the Grant for $746,967. The period of performance was initially from September 1, 2013, to August 31, 2018, but was subsequently extended to August 2020.

16.     The solicitation for the Grant was contained in NASA Research Announcement ("NRA") NNH13ZTT001N. The NRA stated in part:

> [T]his NRA solicits Complex Fluids research proposals from Principal Investigators from U.S. institutions to participate in the Advanced Colloids Experiment (ACE) test series. The ACE will observe the behavior of colloidal systems using a microscope in the microgravity environment of the ISS. By performing soft-condensed matter experiments in a microgravity environment, scientists have been able to remove the masking effects of sedimentation, convection, and particle jamming in a timescale not available on Earth.

17.     In April 2013, TAMU submitted its grant proposal to NASA. TAMU's proposal for the Grant omitted any involvement with individuals/entities in China and clearly stated that the PI, the Co-Investigator, Equipment, and Facilities did not involve activities outside the U.S. or partnerships with international collaborators, other than collaborators from Madrid, Spain, who were to do theoretical modeling work. In the section titled, "International Collaboration," which prompted the Principal Investigator, *i.e.* Cheng, to disclose whether there would be international collaboration in the grant, the proposal stated: "No." TAMU's proposal for the

grant included a resume for Cheng that did not indicate any employment or affiliation with

China, any Chinese-owned company, or any Chinese University.  TAMU officials informed me

that Cheng approved the above application approximately six days before it was submitted to

NASA.

18.     In August 2013, a NASA Shared Services Center ("NSSC") Procurement

Department employee emailed a TAMU Proposal Administrator a detailed description of

NASA's restrictions on funding activities with China and requested the completion of a form

titled "Assurance of Compliance – China Funding Restriction." The NSSC employee informed

TAMU that "[r]eceipt of this form is required by the Grant Officer before signing the award."

The Assurance of Compliance stated in part:

> NASA is restricted from using funds appropriated in the Acts to enter into or fund
> any grant or cooperative agreement of any kind to participate, collaborate, or
> coordinate bilaterally with China or any Chinese-owned company, at the prime
> recipient level and at all subrecipient levels, whether the bilateral involvement is
> funded or performed under a no-exchange of funds agreement. (2) Definition:
> "China or Chinese-owned Company" means the People's Republic of China, any
> company owned by the People's Republic of China, or any company incorporated
> under the laws of the People's Republic of China…By submission of its proposal,
> the proposer represents that the proposer is not China or Chinese-owned
> company, and that the proposer will not participate, collaborate, or coordinate
> bilaterally with China or any Chinese-owned company, at the prime recipient
> level or at any sub recipient level, whether the bilateral involvement is funded or
> performed under a no-exchange of funds arrangement.

19.     On August 29, 2013, the TAMU Proposal Administrator replied to the NSSC

employee, and carbon copied Cheng on the response.  The email chain contained the above

information and stated, "[NSSC employee], per your request please find the signed forms

attached for Dr. Zhengdong Cheng – Assurance of Compliance – China Funding Restrictions…"

The Assurance of Compliance was signed by TAMU's Director of Contracts and Grants and

dated August 29, 2013.

20.     Email correspondence from August 29, 2013, makes clear that Cheng was aware of restrictions on the involvement of China and Chinese institutions in the research conducted pursuant to the Grant.  On that same day, Cheng emailed the NSSC employee, with others carbon copied, and said that "[s]ince NASA is watching the CHINA involvement, I would like to disclose to NASA that I am hiring new graduate students this fall or in the coming spring for the project, they might turn out to be Chinese students. I want to make sure that this would be ok. Please advise."  Notably, Cheng did not at this time state that he was employed by or in any other way affiliated with China, any Chinese-owned company, or any Chinese university.

21.     On September 19, 2013, NASA awarded the Grant to TAMU.  The Grant included a statement that "Restrictions on Funding Activities with China for Awards Subject to 14 CFR 1260," and provided the contents of the restriction in its entirety.  The Grant further incorporated the NASA Grant Solicitation, TAMU's proposal, and TAMU's signed assurance of compliance.

22.     Eleven days later, on September 30, 2013, Cheng certified and submitted an annual "Financial Disclosure Statement" to TAMU.  The statement did not list any Chinese consulting, external employment, or research activities.

23.     In or about July 2015, as part of the administration of the Grant, Cheng explicitly affirmed to TEES Compliance Officers that "I have read the language related to NASA's Restrictions on Funding Activities with China, and I will not share any of the research equipment, technology, or software with China or anyone affiliated with any Chinese-owned company or institution (this includes any visiting scholars from Universities in China) without first obtaining an export control license from the U.S. Department of State or the U.S.

Department of Commerce."  NASA's Restrictions on Funding Activities with China included the above language regarding Chinese universities and companies.

*Cheng Did Not Disclose His Employment or Association with China, Chinese-owned Companies, or Chinese Universities During the Preparation, Submission, and Performance of the Grant*

24.     Multiple publications authored by Cheng revealed that from at least 2012 to 2018, in no less than thirteen published research papers, Cheng's affiliation was listed as Guangdong Provincial Key Laboratory on Functional Soft Condensed Matter, School of Materials and Energy, Guangdong University of Technology, Guangzhou 510006, China.   Some publications further identify Cheng as a faculty member of GDUT.  Eight of the articles listed Cheng's affiliation as both GDUT and TAMU.  Fourteen of Cheng's publications acknowledged financial support from the National Science Foundation of China ("NSFC"), and two of those publications listed financial support from both the NSFC and the Grant.

25.     Cheng obtained at least two Chinese patents as a direct result of his work for GDUT and Foshan City Ge Wei Technology Co., Ltd.  These patents were filed in 2016, and 2017 (during the performance of Cheng's NASA grant). Cheng's patent documents that investigators discovered were in Mandarin, and had to be translated.

        a.     Cheng was an inventor on a GDUT patent application filed in China. Patent application CN105854967A was filed by GDUT on June 15, 2016.  The application was for a microfluidic chip device and microfluidic channel structure, and Cheng was listed as one of the inventors.  On July 18, 2017, the rights of the patent application were transferred to include both GDUT and Foshan City Ge Wei Technology Co., Ltd. Cheng was on the board of directors of Foshan City Ge Wei Technology Co., Ltd and a shareholder. In a 2015 PowerPoint presentation titled, "Foshan City Ge Wei

Technology Co., Ltd. Design, Fabrication and Application of High-End Microfluiditic Chips" the pre-patent research is outlined. Under a slide subtitled "Science research projects led during the last five years," the NASA grant is specifically listed number 1 ("Liquid Crystals of Nanoplates. NASA (NASA). $747,000. Sept. 1, 2013 through Aug. 31, 2018").

      b.      Cheng was identified as one of the inventors on Chinese Patent number CN106944155A published on July 14, 2017 entitled, "A kind of method of photochemical catalyst and photocatalytically degradating organic dye," filed by GDUT and the Foshan Chrome Technology Co., Ltd.

      c.      TAMU officials reported that they were unaware Cheng had any Chinese patents.

26.      In Cheng's TTP application, dated June 20, 2018, Cheng wrote: "Professor Cheng established the Soft Matter Research Center at Guangdong University of Technology in 2012 which became the Key Lab of Functional Soft Condensed State Matter of Guangzhou Providence (Professor Cheng is the Lab Director)."  Cheng's statement is corroborated by a 2012 GDUT publication on its online portal.  According to a machine translation of the publication, "Cheng Zhengdong, Professor of Distinguished Professor of the University, Professor of 'Pearl River Scholar,' and Director of the Center for Soft Matter Research of Guangdong University of Technology . . . is currently an associate professor at Texas A&M University."  In a similar publication, GDUT's website described Cheng as "Professor of the 'Hundred Talents Program' of our school, a doctoral tutor, and director of the Soft Substance Research Center."

27.      During the preparation and submission of the Grant, Cheng was a Chair Professor employed by GDUT. Cheng's employment contract was titled "ZHUJIANG (PEARL RIVER)

SCHOLAR OF HIGHER EDUCATION INSTITUTIONS, GUANGDONG PROVINCE CHAIR

PROFESSOR EMPLOYMENT CONTRACT" and dated August 2011. The Hiring Party was

"Guangdong University of Technology (referred to as Party A)" and the Hired Party was

"Cheng, Zhengdong (referred to as Party B)." This employment contract stated Cheng's term of

employment "starts from September 1, 2011 through August 31, 2014 during which period Party

B is committed to work on his position at Party A for three (3) months each year. Under "Article

II" of this employment contract, Party B's Work Objectives and Tasks included 'File application

for more than 1 state-level project and more that 2 province-level projects by listing Party A as

the first participating institution and securing funding in the amount of RMB 1.5 million yuan for

Party A's science research efforts." Cheng's work objectives and tasks also included, "Organize

and establish the soft matter research center of Guangdong University of Technology, assemble

the research team for "Soft Matter" advanced front research, enhance the capability of

engagement in the state's major or key projects, and produce a whole array of high-level

academic research accomplishments." Cheng was also to "Assist to recruit "top notch" overseas

outstanding talents needed by Party A for its developmental efforts of academic discipline of

material science." For Cheng's work, Cheng was to receive ten thousand yuan a month, "based

on actual working months."  Cheng was also to receive one roundtrip international flight ticket

between "Guangzhou and U.S. each year."

  28.  During the preparation and submission of the Grant, and thereafter, from on or

about September 1, 2011 to Present, Cheng was further employed by GDUT as a "Special Hire

Professor under Hundred Talents Program." According to a record titled "General accounting of

Salaries/Wages for Special-Hire Professor under Hundred Talents Program," Cheng's "Position"

was listed as "No-Full Time Special Hire Professor of School of Materials and Energy." This

Salaries/Wages spreadsheet spanned from approximately September 2011 to August 2016, and listed Cheng's claimed number of work days for this period as 330. The spreadsheet further reflected that Cheng had been paid 412,748.00 yuan, and was due another 37,252 yuan. According to Cheng's signed employment contract for "Position of Special Hire" with GDUT, dated September 1, 2016, Cheng was to serve a term from "09/01/2016 to 08/31/2021."  This contract stated that Cheng will work at GDUT School of Materials and Energy, for three months a year. Cheng's monthly salary was to be Fifty Thousand Yuan.  In Cheng's contract under "Objectives and job tasks during the term of employment," one of the items listed that Cheng was to "Take up the management work of the Guangdong province key lab; maintain the international exchange of the laboratory and assure the international conference related to soft substance to take place on regular schedule with continuously increasing influences."

*Cheng Made Additional Affirmations During the Course of the Grant*

29.     During the course of his work on the Grant, Cheng made various affirmations in which he did not disclose any connection to China, Chinese-owned companies, or Chinese universities.

30.     Cheng was required to report and request permission for faculty consulting and external professional employment positions. Cheng was also required to report on a Financial Disclosure Statement each year all research or research activities in which he is engaged for TAMU.   TAMU reported that, from 2012 to Present, Cheng did not report any Chinese consulting, external employment, or external research activities.  Specifically, Cheng submitted certifications on August 24, 2012, September 5, 2012, September 30, 2013, October 1, 2014, October 8, 2015, October 10, 2016, October 16, 2017, October 16, 2018, and October 7, 2019. None of the affirmations made mention of Cheng's work for GDUT or any external Chinese

entity. TAMU reported that had Cheng reported these activities, TEES would have reached out

to the NASA Contracting Office about grant compliance issues.  NASA confirmed that had they

known about Cheng's affiliations, they would not have awarded the Grant to TAMU with Cheng

as the PI.

31.     In 2016, Cheng submitted a curriculum vitae ("CV") in connection with his

application for a Full Professor position with TAMU.  Along with his CV, on or about March 26,

2016, Cheng submitted a signed declaration titled, "Statement Regarding Curriculum Vitae."

The declaration stated, "I, Zhengdong Cheng, declare that the enclosed curriculum vitae is

correct and current as of the date on my signature below[.]"  Cheng's CV contained headings for,

"Research Interests," "Appointments," "Honors and Awards," "Synergistic Activities,"

"Industrial collaboration," "International collaboration," "Outreach activities," "Teaching,"

"University and community service," "Multidisciplinary Strategic Areas at the University

Level," "Internationalization," and "Professional Outreach."  Nowhere, on the CV did Cheng

disclose either of his true affiliations with GDUT or Foshan City Ge Wei Technology Co., Ltd.

32.     On or about June 22, 2020, Cheng completed his TAMU College of Engineering

Annual Disclosure Questionnaire.  Cheng answered 'no' to the following questions:

> Do you conduct any external consulting or other employment (including contract
> work) outside of your assigned position with Texas A&M University College of
> Engineering (TAMUCOE) or Texas A&M Engineering Experiment Station
> (TEES) for any foreign or domestic entity? **Answer: NO**
>
> With regard to any publicly traded entity, in the past 12 months, have you
> received remuneration (salary, consulting fees, honoraria, paid authorship) and/or
> held any equity interest (stock, stock option, or other ownership interest) that
> exceeds $5,000, when aggregated? (This would not include income from
> investment vehicles, such as mutual funds and retirement accounts, as long as you
> do not directly control the investment decisions made in these vehicles)  **Answer:
> NO**

With regard to any non-publicly traded entity, in the past 12 months, have you received remuneration (salary, consulting fees, honoraria, paid authorship) that exceeds $5,000 or do you hold any equity interest (e.g. stock, stock option, or other ownership interest)? **Answer: NO**

In the past 12 months, have you held a board or fiduciary/trustee position with a foreign or domestic organization? **Answer: NO**

Apart from any disclosures of external consulting or other outside employment in the three previous questions, do you maintain a position/role/distinction at another foreign or domestic entity? (ex. Adjunct, Visiting, Guest, Honoraria, Chair, etc.) **Answer: NO**

Do you have access to graduate students, lab space, materials, etc. at a foreign or domestic entity other than TAMUCOE/TEES/TAMUQ? **Answer: NO**

Do you receive any paid travel or travel reimbursement from a foreign or domestic source? **Answer: NO**

Do you conduct any research under any external (Non-TAMUCOE or Non-TEES) awards or subawards that is not managed by TAMUCOE/TEES? **Answer: NO**

Do you list any affiliation (other than TAMUCOE, TEES or other TAMUS members) on your publications? **Answer: NO**

Do you participate in any foreign talent recruitment programs? **Answer: NO**

Do you have any collaborations with foreign entities, institutes, university labs or private entities in terms of joint projects, research, proposal reviews or other educational activities outside of TAMUCOE/TEES approved agreements? **Answer: NO**

In the past 12 months, have you engaged in evaluating proposals for foreign and other committees related to research and research policy or education? **Answer: NO**

With regard to System Policy 33.04, related to Use of System Resources, please confirm that you DO NOT engage in any practices that may be deemed as an improper use of system resources (equipment, vehicles, procurement cards, funds, etc.) which could lead to increased costs and risks to the system, particularly from operational, regulatory, and reputational standpoints? **Answer: I confirm**

Future External Employment System regulation 31.05.01 and 31.05.02 require disclosure of all external employment. If a new relationship is proposed that was not previously disclosed, you can comply with this regulation by submitting the

following form at any time: Faculty: https://it-lf-ecmf2.ads.tamu.edu/Forms/ENGR-Faculty-Consulting-;  Request Staff: https://it-lf-ecmf2.ads.tamu.edu/Forms/ENGR-Staff-External-Employment. **Answer: If I intend to undertake external employment, I will submit a form for approval**

*Other Indicia That Cheng Was Aware of NASA Restrictions*

33.     During the course of the Grant, Cheng was provided with additional information about NASA restrictions on the Grant that specifically pertained to China and Chinese institutions.   For example, in April 2015, Cheng exchanged e-mails with a TAMU compliance officer about a visiting scholar from China. In the email chain, Cheng was told that the visiting scholar could not work on the Grant.  Cheng forwarded the email chain to the visiting scholar and stated: "[t]here is some delay in the process of your paper work. The main reason is that the original proposal for your research is on Liquid crystals, which I have a project is sponsored by NASA, which specifically restrict collaboration with China."

34.     Similarly, in or about July 2015, a TAMU Compliance officer e-mailed Cheng a link to Frequently Asked Questions (FAQs) published by NASA to help their internal and external research community better understand the restrictions.  In response, Cheng certified that no one affiliated with Chinese-owned businesses would work on the Grant, stating:

> I have read the language related to NASA's Restrictions on Funding Activities with China, and I will not share any of the research equipment, technology, or software with China or anyone affiliated with any Chinese-owned company or institution (this includes any visiting scholars from Universities in China) without first obtaining an export control license from the U.S. Department of State or the U.S. Department of Commerce.

35.     TAMU officials also brought the NASA restrictions to Cheng's attention in 2017. In or about September 2017, an NSSC employee e-mailed TAMU and stated that "It has been brought to my attention that PI Zhengdong Cheng has been on a sabbatical to China for three month[s]. Per 1800.905(a) the absence of the PI for three month requires approval. Can you please advise me of the status of the PI? Can you also please advise if the PI has ties to China?"

16

A TAMU employee e-mailed Cheng, reminding him that he needed to obtain TAMU's permission to leave for such an extended period of time.  In or about November 2017, Cheng sent a TAMU employee the following proposed language to send to NASA:

> While Dr. Cheng was in China, he continued to contribute to the project and worked with his graduate student [omitted] (also NASA management Padetha and Hunt) and others in the research group. Dr. Cheng is currently stateside and will be returning to China soon for planned travel and meetings, but will continue to work on the project while in China. Dr. Cheng does have family in China. The sabbatical to China was approved by the University through the Dean of Faculty Office. While on sabbatical, Dr. Cheng spent time in the United States to work and attend meetings (such as the ASGSR and ACHIE meetings) on research projects.

36.     Later in November 2017, a TAMU compliance officer recommended that Cheng not work on the Grant while in China.  In doing so, the TAMU compliance officer e-mailed Cheng that "[i]n the NASA agreement they included a clause regarding Chinese owned companies and institutions" and attached the certification from the project that includes the language.  Cheng was also informed that since he was on sabbatical, another professor would have to be assigned to host visiting scholars in his absence.  Cheng was informed that his substitute would have to take Export Control training.

37.     Similarly, in December 2017, a NASA employee e-mailed NASA's policies on Foreign Citizens and Technology Transfer to Cheng, among others.   The email contained the specific language on NASA's Restrictions on Funding Activities with China.

*Cheng Knowingly Violated NASA Regulations by Maintaining Associations with Prohibited Chinese Entities*

38.     Cheng maintained several undisclosed associations with Chinese institutions in violation of NASA restrictions.  As stated previously, Cheng's TTP application identified Cheng as: 1) the Director of the Soft Matter Institute of GDUT from in or about 2012 through at least 2018; 2) partial owner of Foshan City Ge Wei Technology Company, Ltd. (China) from in or

about 2014 to at least 2019; 3) a paid Visiting Professor at the Academy for Advanced

Interdisciplinary Studies at Southern University of Science and Technology (China) from in or

about December 2018 to in or about August 2018.

39.     Cheng further maintained a relationship with a Chinese government entity.  On

August 12, 2015, Cheng emailed a GDUT Professor (hereafter "GDUT Professor 1") a

PowerPoint document.  An FBI translation of the PowerPoint document revealed that the

document was titled, "Design, Fabrication and Application of High-End Microfluidic Chips,"

and concerned a project involving GDUT and Foshan City Ge Wei Technology Co., Ltd.  Cheng

was listed as an owner of Foshan City Ge Wei Technology, as well as the person in charge of the

project.  GRC Grant No. NNX13AQ60G was specifically referenced in the presentation.  The

PowerPoint stated in part, "The principal of Project Professor Cheng, Zhengdong is committed to

work no less than 6 months cumulatively at Foshan Ge Wei Technology Co., Ltd.  Each year,

and his work at the original employer shall not affect the requirements of the work schedule in

Foshan.  All member of this team are committed to work full time at Foshan Ge Wei Technology

Co., Ltd., associated with Guangdong University of Technology and will sign a 3-year or longer-

term contract with **City's Bureau of Science and Technology to work in Foshan** [Emphasis

added]. They will be engaged in microfluidics chip research and application project, and use the

government funds in accordance with the provision in the contract."

*Along with His Co-conspirators, Cheng Knowingly Violated NASA Regulations by Participating,*
*Collaborating, or Coordinating Bilaterally with China and Chinese-owned Companies and*
*Entities*

40.     Cheng conspired with individuals both known and unknown to the Government to

conceal his affiliations and collaborations with Chinese institutions and companies during the

performance of the Grant.  It was an object and result of the scheme to circumvent NASA's

restrictions and receive U.S. Government funding.  As part of the scheme, Cheng maintained his

role as a Professor and Director of the Center for the Soft Matter Research of GDUT.

41.     Cheng, along with co-conspirators (hereafter referred to as "TAMU Researcher

1", "TAMU Researcher 2," and "TAMU Researcher 3") knowingly violated NASA regulations

by participating, collaborating, or coordinating with Chinese-owned companies and institution.

According to an e-mail from TAMU Researcher 1 to Cheng, as of 2014, Cheng's U.S.-based

research team at TAMU had "hardly did any" research for the Grant.  In order to fulfil the

research and deliverable requirements of the Grant and to continue to receive NASA funds,

Cheng turned to research performed at GDUT by Cheng's China-based researcher  (hereafter

"GDUT Researcher 1"), and then passed on the results to NASA, according to multiple e-mails

involving Cheng.

42.     For instance, on or about April 14, 2014, Cheng forwarded an e-mail from GDUT

Researcher 1 to TAMU Researcher 2.  The e-mail from GDUT Researcher 1 contained research

results ("RESULTS 1").  GDUT Researcher 1 was then added to a series of e-mails among

Cheng and his TAMU research students (including TAMU Researchers 1&2) discussing

RESULTS 1.  Cheng later actively hid GDUT Researcher 1's involvement with the experiments

which yielded RESULTS 1.  In May 2014, TAMU Researcher 2 asked Cheng who should be

listed as authors, Cheng e-mailed that "GDUT Research 1 is hard to be right now because of the

nasa [*sic*] prohibition."  TAMU Researcher 2 responded "Yes, That is what I am considering.

They don't want too many Chinese ☺" to which Cheng replied: "No Chinese organizational

collaboration."

43.     On June 21, 2014, Cheng forwarded an email from the American Physics Society

to GDUT Researcher 1, GDUT Professor 1, and TAMU Researcher 2.  The American Physics

Society email related to the submission of a scientific manuscript concerning RESULTS 1. The authors listed for the manuscript included GDUT Researcher 1, GDUT Professor 1, and Cheng. The report contained RESULTS 1.

44.     On July 26, 2014, Cheng emailed a NASA employee a deliverable, *i.e.*, results required to continue to receive the Grant. The deliverable was titled, "Year 2013-2014 report Liquid Crystals of Nanoplates" and contained RESULTS 1.

45.     Similarly, a paper published in June 2015 reveals Cheng continued to collaborate with GDUT Researcher 1 on research related to the Grant.  On June 15, 2015, *Soft Matter* published a research paper titled, "Observation of isotropic-isotropic demixing in colloidal platelet-sphere mixtures."  Under "[a]cknowledgements," the paper stated, "[t]his work is partially supported by NSF (DMR-1006870) and NASA (NASA-NNX13AQ60G).  The authors and their affiliations were: two GDUT employees, GDUT Researcher 1, two TAMU researchers (including TAMU Research 2), and Cheng.

46.     In June of 2015 Cheng emailed GDUT Professor 1 a draft PowerPoint presentation. This presentation's title slide included: 1st Year Research Results & Future Directions of the Lab; Zhengdong Cheng; May 16, 2015; Guangdong Provincial Key Laboratory of Functional Soft Condensed Matter, ("GPKL FSCM"); School of Materials Science & Energy, Guangdong University of Technology; Soft Matter International Laboratory Enterprise; (SMILE).

47.     The presentation listed the "Mission of the Laboratory" as "This Guangdong Provincial Key Laboratory is a international enterprise on soft matter, serving the students and faculty of GDUT, and collaborating with the industry and society of southern China."

48. The presentation had researcher assignments for specific laboratory technologies. Under the technology "Liquid Crystals" subset "ZrP" were TAMU Researcher 1, TAMU Researcher 3, and GDUT Researcher 1. Under "Liquid Crystals" subset "Nanoplate Surfactants," four TAMU researchers were listed including TAMU Researchers 2 & 3. Under "Liquid Crystals" subset "Hydrogels," TAMU Researcher 2 was listed.  Under "Energy Materials" subset "Carbon Materials," TAMU Researcher 3 was listed. Under "Energy Materials" subset "Nano fluids," TAMU Researcher 2 was listed. In total, this presentation reflected that approximately eight TAMU researchers were working on research technologies for GPKL FSCM. Cheng, along with five of listed TAMU researchers (including TAMU Researchers 1&3) were specifically being paid NASA Grant moneys during the periods they are listed as performing research for the "GPKL FSCM" laboratory (2014/2015).

49. In November 2017, in response to NASA's review of whether the Grant restrictions had been complied with by Cheng, Cheng exchanged e-mails with a number of individuals to include TAMU Researchers 1 & 3  about bringing "possible mistakes" to NASA's attention.  Among the "possible mistakes" mentioned was Cheng's acknowledgement of the Grant in three research publications.  During the exchange of emails, a co-conspirator proposed the false narrative that "the research work in the published papers by Chinese university has nothing related to NASA project." TAMU Researcher 1 agreed, and later sent an email to NASA management containing a similar false assertion.

*TAMU's requests for payment and certifications to NASA*

50. From on or about February 18, 2014, to December 6, 2019, TAMU submitted eighty-three invoices by wire from College Station, Texas, to NASA in Mississippi via the U.S.

Department of Health and Human Services, Payment Management System ("HHS PMS"),

requesting and receiving $662,045.28 in payments from NASA in accordance with the Grant.

51.     TAMU further submitted quarterly Federal Financial Reports ("FFRs") to NASA

for the Grant.  The FFRs reported the Grant funds TAMU received from NASA during the

reporting period.  Over the life of the Grant, there were 31 FFRs submitted to NASA.  All of the

FFRs were signed by a TAMU employee and contained the following certification:

> By signing this report, I certify to the best of my knowledge and belief that the report is
> true, complete, and accurate, and the expenditures, disbursements and cash receipts are
> for the purposes and intent set forth in the award documents.  I am aware that any false,
> fictitious, or fraudulent information may subject me to criminal, civil, or administrative
> penalties. (U.S. Code, Title 18, Section 1001).

52.     From on or about February 18, 2014 through on or about November 7, 2019,

TAMU submitted the following invoices by wire from College Station, Texas, to NASA in

Mississippi via the U.S. Department of Health and Human Services, Payment Management

System ("HHS PMS"), requesting and receiving $662,045.28 in payments from NASA in

accordance with the Grant:

| Invoice Document Number | Smart Number | Name | NASA Invoice Status | Current Amount | Document Date | PPA Due Date |
|---|---|---|---|---|---|---|
| 5601961067 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,881.64 | 2/18/2014 | 3/19/2014 |
| 5601981803 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,008.76 | 3/20/2014 | 4/18/2014 |
| 5601992596 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,008.76 | 4/14/2014 | 5/13/2014 |
| 5602008275 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,008.76 | 5/7/2014 | 6/5/2014 |
| 5602025857 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,570.50 | 6/6/2014 | 7/7/2014 |

| 5602048027 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,084.97 | 7/15/2014 | 8/13/2014 |
| 5602067843 | NNX13AQ60G | TEXAS A&M | Confirmed | 9,894.13 | 8/14/2014 | 9/12/2014 |
| 5602084071 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,419.90 | 9/11/2014 | 10/10/2014 |
| 5602103423 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,932.56 | 10/8/2014 | 11/6/2014 |
| 5602121122 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,980.89 | 11/10/2014 | 12/9/2014 |
| 5602134773 | NNX13AQ60G | TEXAS A&M | Confirmed | 13,209.13 | 12/3/2014 | 1/2/2015 |
| 5602155918 | NNX13AQ60G | TEXAS A&M | Confirmed | 16,137.10 | 1/15/2015 | 2/13/2015 |
| 5602174505 | NNX13AQ60G | TEXAS A&M | Confirmed | 17,084.98 | 2/12/2015 | 3/13/2015 |
| 5602193246 | NNX13AQ60G | TEXAS A&M | Confirmed | 12,350.64 | 3/13/2015 | 4/13/2015 |
| 5602207419 | NNX13AQ60G | TEXAS A&M | Confirmed | 17,169.23 | 4/9/2015 | 5/8/2015 |
| 5602237702 | NNX13AQ60G | TEXAS A&M | Confirmed | 10,590.45 | 5/22/2015 | 6/22/2015 |
| 5602245706 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,667.60 | 6/11/2015 | 7/10/2015 |
| 5602286439 | NNX13AQ60G | TEXAS A&M | Confirmed | 30,000.00 | 8/13/2015 | 9/11/2015 |
| 5602303883 | NNX13AQ60G | TEXAS A&M | Confirmed | 24,724.38 | 9/14/2015 | 10/13/2015 |
| 5602332698 | NNX13AQ60G | TEXAS A&M | Confirmed | 275.62 | 10/26/2015 | 11/24/2015 |
| 5602338383 | NNX13AQ60G | TEXAS A&M | Confirmed | 24,421.23 | 11/6/2015 | 12/7/2015 |
| 5602344537 | NNX13AQ60G | TEXAS A&M | Confirmed | 573.01 | 11/16/2015 | 12/15/2015 |
| 5602390512 | NNX13AQ60G | TEXAS A&M | Confirmed | 5.76 | 2/8/2016 | 3/8/2016 |
| 5602405205 | NNX13AQ60G | TEXAS A&M | Confirmed | 61,930.91 | 3/4/2016 | 4/4/2016 |
| 5602409356 | NNX13AQ60G | TEXAS A&M | Confirmed | 426.32 | 3/14/2016 | 4/12/2016 |
| 5602424399 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,833.15 | 4/5/2016 | 5/4/2016 |
| 5602432744 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,809.62 | 4/18/2016 | 5/17/2016 |
| 5602472018 | NNX13AQ60G | TEXAS A&M | Confirmed | 25,015.37 | 6/24/2016 | 7/25/2016 |

| 5602478336 | NNX13AQ60G | TEXAS A&M | Confirmed | 23,074.99 | 7/11/2016 | 8/9/2016 |
|---|---|---|---|---|---|---|
| 5602486287 | NNX13AQ60G | TEXAS A&M | Confirmed | 253.70 | 7/22/2016 | 8/22/2016 |
| 5602493737 | NNX13AQ60G | TEXAS A&M | Confirmed | 8,431.76 | 8/8/2016 | 9/6/2016 |
| 5602504511 | NNX13AQ60G | TEXAS A&M | Confirmed | 916.66 | 8/22/2016 | 9/20/2016 |
| 5602512934 | NNX13AQ60G | TEXAS A&M | Confirmed | 12,307.52 | 9/9/2016 | 10/11/2016 |
| 5602567332 | NNX13AQ60G | TEXAS A&M | Confirmed | 42,932.21 | 12/9/2016 | 1/9/2017 |
| 5602581066 | NNX13AQ60G | TEXAS A&M | Confirmed | 9,508.63 | 1/6/2017 | 2/6/2017 |
| 5602599748 | NNX13AQ60G | TEXAS A&M | Confirmed | 680.85 | 2/10/2017 | 3/13/2017 |
| 5602609518 | NNX13AQ60G | TEXAS A&M | Confirmed | 2,267.69 | 2/24/2017 | 3/27/2017 |
| 5602615408 | NNX13AQ60G | TEXAS A&M | Confirmed | 8,622.58 | 3/10/2017 | 4/10/2017 |
| 5602637706 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,736.10 | 4/14/2017 | 5/15/2017 |
| 5602652384 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,870.31 | 5/12/2017 | 6/12/2017 |
| 5602663837 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,110.34 | 6/2/2017 | 7/3/2017 |
| 5602667153 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,430.76 | 6/9/2017 | 7/10/2017 |
| 5602682887 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,724.71 | 7/10/2017 | 8/8/2017 |
| 5602685806 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,560.68 | 7/14/2017 | 8/14/2017 |
| 5602698525 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,394.43 | 8/4/2017 | 9/5/2017 |
| 5602707533 | NNX13AQ60G | TEXAS A&M | Confirmed | 183.40 | 8/18/2017 | 9/18/2017 |
| 5602712663 | NNX13AQ60G | TEXAS A&M | Confirmed | 345.00 | 8/25/2017 | 9/25/2017 |
| 5602730205 | NNX13AQ60G | TEXAS A&M | Confirmed | 4,772.85 | 9/25/2017 | 10/24/2017 |
| 5602754348 | NNX13AQ60G | TEXAS A&M | Confirmed | 10,970.82 | 11/3/2017 | 12/4/2017 |
| 5602774108 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,782.96 | 12/8/2017 | 1/8/2018 |
| 5602783406 | NNX13AQ60G | TEXAS A&M | Confirmed | 171.85 | 12/22/2017 | 1/22/2018 |

| 5602793754 | NNX13AQ60G | TEXAS A&M | Confirmed | 4,717.26 | 1/19/2018 | 2/20/2018 |
|---|---|---|---|---|---|---|
| 5602805032 | NNX13AQ60G | TEXAS A&M | Confirmed | 2,322.03 | 2/6/2018 | 3/7/2018 |
| 5602812656 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,116.71 | 2/16/2018 | 3/19/2018 |
| 5602823930 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,894.74 | 3/9/2018 | 4/9/2018 |
| 5602842487 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,842.08 | 4/13/2018 | 5/14/2018 |
| 5602849562 | NNX13AQ60G | TEXAS A&M | Confirmed | 493.35 | 4/23/2018 | 5/22/2018 |
| 5602855513 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,547.66 | 5/4/2018 | 6/4/2018 |
| 5602855515 | NNX13AQ60G | TEXAS A&M | Confirmed | 7,125.80 | 5/4/2018 | 6/4/2018 |
| 5602875736 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,479.31 | 6/8/2018 | 7/9/2018 |
| 5602885633 | NNX13AQ60G | TEXAS A&M | Confirmed | 48.07 | 6/22/2018 | 7/23/2018 |
| 5602890767 | NNX13AQ60G | TEXAS A&M | Confirmed | 17,116.83 | 7/6/2018 | 8/6/2018 |
| 5602906706 | NNX13AQ60G | TEXAS A&M | Confirmed | 22,361.19 | 8/6/2018 | 9/4/2018 |
| 5602928265 | NNX13AQ60G | TEXAS A&M | Confirmed | 18,616.04 | 9/14/2018 | 10/15/2018 |
| 5602967038 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,252.76 | 11/16/2018 | 12/17/2018 |
| 5602967089 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,602.30 | 11/16/2018 | 12/17/2018 |
| 5602978225 | NNX13AQ60G | TEXAS A&M | Confirmed | 12,947.16 | 12/10/2018 | 1/8/2019 |
| 5602994659 | NNX13AQ60G | TEXAS A&M | Confirmed | 2,842.63 | 1/11/2019 | 2/11/2019 |
| 5602997628 | NNX13AQ60G | TEXAS A&M | Confirmed | 654.60 | 1/18/2019 | 2/19/2019 |
| 5603011632 | NNX13AQ60G | TEXAS A&M | Confirmed | 301.12 | 2/7/2019 | 3/8/2019 |
| 5603015945 | NNX13AQ60G | TEXAS A&M | Confirmed | 850.49 | 2/14/2019 | 3/15/2019 |
| 5603030290 | NNX13AQ60G | TEXAS A&M | Confirmed | 10,919.26 | 3/7/2019 | 4/5/2019 |
| 5603046510 | NNX13AQ60G | TEXAS A&M | Confirmed | 8,078.82 | 4/4/2019 | 5/3/2019 |
| 5603049574 | NNX13AQ60G | TEXAS A&M | Confirmed | 717.67 | 4/11/2019 | 5/10/2019 |

| 5603064402 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,306.54 | 5/2/2019 | 5/31/2019 |
|---|---|---|---|---|---|---|
| 5603067491 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,601.66 | 5/9/2019 | 6/7/2019 |
| 5603071786 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,270.00 | 5/16/2019 | 6/14/2019 |
| 5603079262 | NNX13AQ60G | TEXAS A&M | Confirmed | 578.06 | 5/23/2019 | 6/21/2019 |
| 5603085234 | NNX13AQ60G | TEXAS A&M | Confirmed | 1,445.78 | 6/6/2019 | 7/5/2019 |
| 5603121411 | NNX13AQ60G | TEXAS A&M | Confirmed | 6,106.00 | 8/8/2019 | 9/6/2019 |
| 5603141346 | NNX13AQ60G | TEXAS A&M | Confirmed | 3,026.75 | 9/12/2019 | 10/11/2019 |
| 5603160931 | NNX13AQ60G | TEXAS A&M | Confirmed | 16,915.71 | 10/10/2019 | 11/8/2019 |
| 5603177664 | NNX13AQ60G | TEXAS A&M | Confirmed | 5,880.73 | 11/7/2019 | 12/6/2019 |
| | | | | 662,045.28 | | |

53.     TAMU was also required to submit quarterly Federal Financial Reports ("FFRs") to NASA for the Grant.  The FFRs reported the Grant funds TAMU received from NASA during the reporting period.  Over the life of the Grant, there were 31 FFRs submitted to NASA.  All of the FFRs were signed by a TAMU employee and contained the following certification:

> By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and intent set forth in the award documents.  I am aware that any false, fictitious, or fraudulent information may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

54.     The allegations set forth above in paragraphs 1 through 53 are incorporated herein by reference.  The allegations in paragraphs 13, 40, and 41 are specifically incorporated herein as the manner and means and paragraphs 17 through 39 and 42 through 53 are specifically incorporated herein as the overt acts.

26

55.     From in or about 2014 through the date of this Indictment, in the Southern District of Texas and elsewhere, the defendant, ZENGDONG CHENG, did unlawfully, willfully, and knowingly conspire, confederate and agree with other individuals both known and unknown to the Grand Jury, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of NASA by concealing his affiliations and collaborations with Chinese institutions and companies during the performance of the NASA Grant thereby circumventing NASA's China Funding Restriction in order to receive U.S. Government funding.

In violation of Title 18, United States Code, Section 371.

## COUNTS TWO – EIGHT
### (Wire Fraud – 18 U.S.C. § 1343)

56.     The allegations set forth above in paragraphs 1 through 54 are incorporated herein by reference.

57.     From in or about 2014 through the date of this Indictment, in the Southern District of Texas and elsewhere, the defendant, ZENGDONG CHENG, did unlawfully, knowingly, and with intent to defraud, devise and intend to devise a scheme to defraud NASA, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and half-truths, and concealment of material facts with a duty to disclose.

58.     On or about the dates set forth below, in the Southern District of Texas and elsewhere, Cheng, for the purpose of executing the scheme to defraud, caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, to wit, the wire communications described below:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| TWO | October 26, 2015 | Invoice Number 5602332698 requesting payment of $275.62 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| THREE | November 6, 2015 | Invoice Number 5602338383 requesting payment of $24,421.23 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| FOUR | November 16, 2015 | Invoice Number 5602344537 requesting payment of $573.01 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| FIVE | March 4, 2016 | Invoice Number 5602405205 requesting payment of $61,930.91 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| SIX | December 10, 2018 | Invoice Number 5602978225 requesting payment of $12,947.16 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| SEVEN | March 7, 2019 | Invoice Number 5603030290 requesting payment of $10,919.26 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |
| EIGHT | October 10, 2019 | Invoice Number 5603160931 requesting payment of $ 16,915.71 transmitted from TAMU in Texas to NASA in Mississippi through the Department of Health and Human Services' Payment Management System. |

Each count a separate offense, all in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS NINE – SEVENTEEN
### (False Statements – 18 U.S.C. § 1001)

59. The allegations set forth above in paragraphs 1 through 54 are incorporated herein by reference.

60.     On or about the dates set forth below, the defendant, ZENGDONG CHENG, did willfully and knowingly make, and cause to be made, materially false, fictitious, and fraudulent statements, representations, and omissions in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, defendant Cheng caused TAMU to falsely certify to NASA/JPL via submission of the invoices identified below, that TAMU was in compliance with NASA's China Funding Restriction.

| COUNT | DATE | DESCRIPTION OF FALSE STATEMENT |
|---|---|---|
| NINE | April 18, 2018 | TAMU submission of a Federal Financial Report acknowledging the receipt of $494,958.99 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| TEN | July 23, 2018 | TAMU submission of a Federal Financial Report acknowledging the receipt of $526,770.01 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| ELEVEN | October 10, 2018 | TAMU submission of a Federal Financial Report acknowledging the receipt of $553,261.44 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| TWELVE | January 16, 2019 | TAMU submission of a Federal Financial Report acknowledging the receipt of $595,392.09 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| THIRTEEN | April 10, 2019 | TAMU submission of a Federal Financial Report acknowledging the receipt of $616,196.38 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| FOURTEEN | July 16, 2019 | TAMU submission of a Federal Financial Report acknowledging the receipt of $630,116.09 in cumulative disbursements from NASA for the Grant |

| | | and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
|---|---|---|
| FIFTEEN | October 16, 2019 | TAMU submission of a Federal Financial Report acknowledging the receipt of $652,573.75 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| SIXTEEN | April 27, 2020 | TAMU submission of a Federal Financial Report acknowledging the receipt of $662,045.28 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |
| SEVENTEEN | July 06, 2020 | TAMU submission of a Federal Financial Report acknowledging the receipt of $662,045.28 in cumulative disbursements from NASA for the Grant and certifying that the expenditures, disbursements, and cash receipts were for the purposes and intent set forth in the Grant award documents. |

Each count a separate offense, all in violation of Title 18, United States Code, Sections 1001 and 2.

## FORFEITURE ALLEGATIONS

61.     The allegations contained in Counts One through 53 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(3) and Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461.

62.     Upon conviction of any offense in violation of Title 18, United States Code, Sections 1343, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(3), and Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of any such violation,

including but not limited to, a money judgment in the amount of proceeds derived from any such violation.

63.     If any of the property described above, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and by Title 28, United States Code, Section 2461.

A TRUE BILL:

Signature on file

_____
GRAND JURY FOREPERSON

**Ryan K. Patrick**
United States Attorney

By:   /s/ S. Mark McIntyre
S. Mark McIntyre
Assistant United State Attorney
Southern District of Texas

  /s/ Carolyn Ferko
Carolyn Ferko
Assistant United State Attorney
Southern District of Texas


**John C. Demers**
Assistant Attorney General

  /s/ Mathew McKensie
Mathew McKenzie
Trial Attorney
U.S. Department of Justice National Security Division
Counterintelligence & Export Control Section