# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | Criminal Action H-20-CR-00455 |
| | § | |
| **ZHENGDONG CHENG** | § | |

## ZHENGDONG CHENG'S
## MOTION FOR REVOCATION OF DETENTION ORDER

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ANDREW S. HANEN:

ZHENDONG CHENG, Defendant, ("Dr. Cheng") pursuant to 18 U.S.C. 3145(b),[1] moves this Court to revoke the detention order (ECF 10) and release him pending trial to a third-party custodian with a substantial bond secured by unencumbered real property and electronic monitoring using Global Positioning Satellite technology through the U.S. Probation and Pretrial Services System and other conditions the Court determines appropriate.  In support Dr. Cheng shows:

## I.    Procedural History

The relevant procedural history is as follows:

  o On August 20, 2020, Dr. Cheng, a professor in the Department of Chemical Engineering at Texas A&M University ("TAMU"), was charged by Complaint with wire fraud, false statements, and conspiracy. ECF No. 1.[2] An arrest warrant was issued that day. ECF No. 12.

---

[1] The authority for and relief sought by this motion is statutorily distinct from that sought by Defendant's "Opposed Motion to Reopen Detention Hearing," (ECF No. 24) which this Court denied on December 15, 2020 (ECF No. 29). *Compare* 18 U.S.C. §§ 3142(f)(2)("The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.") and 3145(b) ("If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.")

[2] The September 17, 2020, Indictment is also identified as Document 1 in PACER.

o   On August 23, 2020, Dr. Cheng was arrested. *Id*.

o   On August 28, 2020, an "Order of Detention Pending Trial" was entered. ECF No. 10.

o   On September 17, 2020, Dr. Cheng was charged by Indictment. *See* ECF No. 1.[3]

o   On September 25, 2020, Dr. Cheng was arraigned and entered a plea of not guilty. *See* Minute Entry for September 25, 2020.

o   On November 3, 2020, undersigned counsel were substituted as Dr.Cheng's attorneys of record. ECF Nos. 16 and 18.

o   On November 5, 2020, this case was certified as complex and set for trial on June 21, 2021. ECF No. 22.

o   On November 24, 2030, Dr. Cheng moved to reopen the detention hearing. ECF No. 24. The Government filed a response on December 1, 2020. ECF No. 28.

o   The Court denied the Motion on December 15, 2020.  ECF No. 29.

Defendant is incarcerated at the Federal Detention Center – Houston.[4]

## II.   Bail Reform Act Favors Dr. Cheng's Release

"There can be no doubt that this [Bail Reform] Act clearly favors nondetention." *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir. 1992).  Cheng was not presumptively detained in this case.  By statute, a defendant shall be released pending trial unless a judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e).  The Fifth Circuit notes "that the standard is **reasonably assure** appearance, **not 'guarantee'** appearance." *U.S. v. Fortna,* 769 F.2d 243, 250 (5th Cir. 1985) (emphasis added).  The standard is that of an objectively reasonable assurance of…appearance at trial. *U.S. v. Orta,* 760 F.2d 887, 889 (8th Cir. 1985)(en banc).  As the Fifth Circuit stated,

---

[3] *See* fn. 1.

[4] *See* Federal Bureau of Prisons, "Find an Inmate" at https://www.bop.gov/inmateloc/ (last viewed February 12, 2021).

In making a pretrial detention determination, a judicial officer must bear in mind that "passage of the pretrial detention provision of the 1984 Act did not ... signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial." *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985) (en banc). Rather, **Congress was demonstrating its concern about a small but identifiable group of individuals as to whom pretrial release is inappropriate.** S.Rep. No. 225, 98th Cong., 1st Sess. 6-7, reprinted in 1984 Code Cong. & Ad. News at 3189.

*United States v. Westbrook*, 780 F.2d 1185, 1189 (5th Cir. 1986) (emphasis added).

Dr. Cheng is not in an "inappropriate" pretrial release group.  "Flight risk" is the sole basis for his detention; Dr. Cheng is not a danger to the community. ECF No. 10 at pg. 2.  In assessing flight risk, courts consider factors identified in § 3142(g): the nature and circumstances of the charged offense, and the defendant's history and characteristics, such as ties to the community, past criminal history, and financial resources. *Fortna*, 769 F.2d at 252 (citing 18 U.S.C. § 3142(g)).

Dr. Cheng's indicted offenses do not include "a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involve a minor victim or a controlled substance, firearm, explosive, or destructive device" and do not weigh in favor of detention *See* 18 U.S.C. § 3142(g)(1). Instead, the allegations arise from the former administration's political initiative to enforce a vague statutory prohibition against collaboration with China embedded in NASA appropriations.

### III. Nature and Circumstances of Charged Offenses

#### A.    Indictment Arose from Statutory Prohibition against NASA Collaboration with China or Chinese owned companies.

Dr. Cheng is not accused of personally or directly misrepresenting anything to NASA. Instead, all charges against Dr. Cheng arise from his alleged failure to disclose affiliations with Chinese universities and corporation(s) to his employer, Texas A&M University ("TAMU. The allegation is that Dr. Cheng failed to disclose ties, not stealing secrets or spying.  TAMU applied for and received grants from NASA which were subject to the restrictions in Pub Law 112-55 Sec. 539,

15 STAT. 639 ("Section 539").[5] [6]  *See* "Indictment," ECF No. 1 at pp. 1-4. [7]

NASA began to apply Section 539 to grant recipients and others as a result of the Consolidated and Further Appropriations Act of 2012 ("Appropriations Act"). The contention that Dr. Cheng intentionally misled or deceived his employer, and thereby NASA, depends upon NASA's statutory interpretation and accurate communication of the Appropriation Act's applicability to third parties, including TAMU, to avoid errors and ensure compliance with the intent and letter of the statute.   Reliance upon NASA's interpretation of the prohibition may be problematic.

On October 8, 2013, Section 539's author, Congressman Frank Wolf (R-VA), wrote a widely publicized letter to NASA after the agency banned Chinese scientists from a conference.[8]  He stated, in part:

> As you know, the congressional provision – which has been in place since early 2011 –primarily restricts bilateral, not multilateral, meetings and activities with the

---

[5] The text of Sec. 539 reads:
Sec. 539 (a) None of the funds made available by this Act may be used for the National Aeronautics and Space Administration (NASA) or the Office of Science and Technology Policy (OSTP) to develop, design, plan, promulgate, implement, or execute a bilateral policy, program, order, or contract of any kind to participate, collaborate, or coordinate bilaterally in any way with China or any Chinese-owned company unless such activities are specifically authorized by a law enacted after the date of enactment of this Act. (b) The limitation in subsection (a) shall also apply to any funds used to effectuate the hosting of official Chinese visitors at facilities belonging to or utilized by NASA. (c) The limitations described in subsections (a) and (b) shall not apply to activities which NASA or OSTP have certified pose no risk of resulting in the transfer of technology, data, or other information with national security or economic security implications to China or a Chinese-owned company. (d) Any certification made under subsection (c) shall be sub-mitted to the Committees on Appropriations of the House of Representatives and the Senate no later than 14 days prior to the activity in question and shall include a description of the purpose of the activity, its major participants, and its location and timing.

[6] A similar provision was included in NASA's 2011 continuing resolution at Section 1340(a) of The Department of Defense and Full-Year Appropriations Act, 2011, Public Law 112-10, 125 STAT. 123.

[7] Despite the statements in the Indictment, these restrictions dot not appear in the text of 14 C.F.R. 1260. *Compare* "Indictment," ECF 1 at pp. 5-6 with 14 C.F.R. 1260. Part 1260 also available at https://prod.nais.nasa.gov/pub/pub_library/granta.html (last viewed January 13, 2021).

[8] *See e.g.,* BBC, "NASA reverses conference's ban on Chinese scientists." (October 21, 2013) available at https://www.bbc.com/news/world-asia-24618824 (last viewed January 11, 2021); Sample, Ian, "Nasa admits mistake over Chinese scientists' conference ban" The Guardian (October 11, 2013) available at https://www.theguardian.com/science/2013/oct/11/nasa-chinese-scientists-conference-ban (last viewed January 11, 2021);

Communist Chinese government or Chinese-owned companies. It places no restrictions on activities involving individual Chinese nationals unless those nationals are acting as official representatives of the Chinese government. As such, the email from NASA Ames mischaracterizes the law and is inaccurate.[9]

Due to Congressman Wolf's letter, NASA reversed itself allowing the Chinese scientists to attend the conference. Section 539 is evidently subject to differing interpretations, confusion, and good-faith mistakes about compliance. Beyond confusion, the prosecution of Dr. Cheng and others results from the former Administration's political decision implemented by the Department of Justice (DOJ) as the "China Initiative." That program may soon be overhauled.

On January 5, 2021, a coalition of interest groups and individuals, including the Brennan Center for Justice, sent a letter to then President-elect Biden calling for an end to the "China Initiative" and additional steps to combat the "pervasive racial bias and targeting of Asian American and Asian immigrant scientists, researchers, and students" for offenses such as failing to fully disclose conflict of interest information to their universities or research institutions and other activities that are not normally treated as crimes except under the pretext of combating economic espionage, administrative errors and minor offenses."[10] On January 22, 2021, the *Wall Street Journal* reported that the DOJ is considering an amnesty program for U.S. professors to disclose past foreign funding omitted from their previous disclosures.[11] If implemented, this will be a significant reversal of the Trump administration's self-described "China Initiative" and the conditions that yielded Dr.

---

[9] Smith, Marcia, "Text of October 2013 Wolf Letter to Bolden Regarding Chinese Nationals at NASA Facilities" Spacepolicyonline.com (October 9, 2013) available at https://spacepolicyonline.com/news/text-of-october-2013-wolf-letter-to-bolden-regarding-chinese-nationals-at-nasa-facilities/ (last viewed January 11, 2021.

[10] January 5, 2021, letter to President-elect Biden. Available at https://advancingjustice-aajc.org/sites/default/files/2021-01/Letter%20to%20President-elect%20Biden%20Re%20the%20China%20Initiative.pdf (last viewed January 28, 2021).

[11] Korn, Melissa and Viswantha, Aruna, "Justice Department Weighs Amnesty for Academics to Disclose Foreign Funding," *The Wall Street Journal* (January 22, 2021) available at https://www.wsj.com/articles/justice-department-weighs-amnesty-for-academics-to-disclose-foreign-funding-11611345451?mod=searchresults_pos7&page=1 (last viewed January 25, 2021).

Cheng's prosecution.[12]

A stated goal of the "China Initiative" is to "[d]evelop an enforcement strategy concerning non-traditional collectors (e.g., researchers in labs, universities and the defense industrial base) that are being coopted into transferring technology contrary to U.S. interests."[13]  That appears to be the motivation in Dr. Cheng's prosecution.  However, many people arrested under this initiative, including   Dr. Cheng, are not charged with trade secret theft or any espionage type offense. Dr. Cheng, like other professors, is charged with failing to disclose ties, not stealing secrets or spying. Specifically, Dr. Cheng is charged with conspiracy, wire fraud, and false statements. ECF No. 1  He is presumed innocent, entered a plea of not guilty, and intends to vigorously defend the allegations.

**B.    Inflammatory Allegations Are Irrelevant to the Decision to Release Dr. Cheng**

In opposing Dr. Cheng's motion to re-open, the Government offered anecdotes about various alleged schemes by other individuals elsewhere involving the Chinese military, universities, trade secrets, and other matters unrelated to the facts of this case.  These are irrelevant to and distinguishable from Dr. Cheng's case.  Dr. Cheng is not charged with "Economic Espionage, Theft of Trade Secrets, violations of International Trafficking in Arms Regulations [or] violations of the Atomic Energy Act." *See* ECF No. 28 at pp. 12-13.  It is not alleged Dr. Cheng's work was classified or required a security clearance.  In fact, no security clearance was needed in the underlying NASA grant. In essence, Dr. Cheng is accused of misrepresenting his affiliations to obtain NASA grants to fund unclassified research he would personally perform or lead.

---

[12] Department of Justice "Information about the Department of Justice's China Initiative and a Compilation of China Related Prosecutions Since 2018," (last updated November 12, 2020) available at https://www.justice.gov/opa/information-about-department-justice-s-china-initiative-and-compilation-china-related (last viewed January 25, 2021).

[13] *Id.*

[REDACTED]

## IV. Dr. Cheng is Not a Flight Risk

### A.   Dr. Cheng is Citizen of the U.S., not China, and is Not a Serious Flight Risk

Any alleged flight risk is highly speculative, at best. Dr. Cheng has *does not have in his possession a* valid passport.  He is a United States Citizen. His United States passport was seized by the Government upon his arrest and it remains in their possession. Dr. Cheng is *not* a citizen of China and has no valid Chinese passport.  He forfeited his Chinese citizenship when he became a U.S. Citizen because China does *not* recognize dual citizenship.[14]

---

[14] *See* PRC Nationality Law, arts. 3, 9, published on the website of the Embassy of the People's Republic of China in the United States of America, "Nationality Law of the People's Republic of China," (Adopted at the Third Session of the Fifth National People's Congress, promulgated by Order No.8 of the Chairman of the Standing Committee of the National People's Congress on and effective as of September 10, 1980).

For a substantial portion of his adult life, Dr. Cheng has lived in the United States. Starting in 1999 he attended Princeton University (Princeton, NJ) as a Postdoctoral Fellow (1999-2000). Later, Dr. Cheng attended Harvard University (Cambridge, MA) as a Postdoctoral Fellow (2002-2004). Dr. Cheng also worked as an engineer between academic stints at various companies located in the U.S. In 2004, Dr. Cheng relocated to Texas A&M University (College Station, TX) to become a professor.

### B.   Dr. Cheng Has No Means of Flight to China

The Government contends that Dr. Cheng's "experience with international travel" substantiates "there are no bond conditions that will reasonably assure his appearance at future proceedings." ECF 28 at 27. This contention is undermined by the lack of evidence Dr. Cheng has experience traveling as a fugitive without a passport. There is simply no common skill set between legal, business or personal travel and the ability to navigate international borders and oceans as a fugitive from justice without a passport.

Without a valid passport, Dr. Cheng cannot travel to China or anywhere outside of the United States. The Government has *never* offered *any* theory as to how Dr. Cheng could or would flee overseas. Indeed, federal regulations demonstrate otherwise. The United States requires travel documents for airline departure. *See* 19 C.F.R. §§ 122.22 (private aircraft), 122.49d, and 122.75 (commercial aircraft). [15]  Airlines are legally required to collect and report passenger identity and passport information to the Advance Passenger Information System (APIS). *Id.* According to Customs and Border Protection, a "carrier will not permit the boarding of a passenger unless the

---

[15] *See also* U.S. Department of Homeland Security, Bureau of Customs and Border Protection, "Documents Required for Air Travel" (last modified January 17, 2014) available at https://www.cbp.gov/travel/us-citizens/whti-program-background/docs-air-travel (last viewed January 11, 2021).

passenger has been cleared by CBP."[16]

### C.   Any Risk Dr. Cheng Would Take Refuge in a Chinese Consulate is Illusory

There is virtually no risk that Dr. Cheng will take refuge in the Chinese embassy or a consulate.  There is no longer a Chinese consulate in Houston.  The nearest is in Los Angeles. The fear that Dr. Cheng would break electronic monitoring, elude law enforcement officers, and travel halfway across the United States to obtain refuge amounting to indefinite detention in a diplomatic facility is born out of imagination rather than reality. Another "China Initiative" case demonstrates that this risk is minimal, and release is appropriate.

In *United States v. Tang Juan*, 2:20-cr-134 (E.D. Ca. June 26, 2020) [17] [18] the Government charged Ms. Tang, a citizen of China (unlike Dr. Cheng who is a U.S. Citizen), with lying about her Chinese military affiliation (Dr. Cheng has none) in her visa application to come to the United States to study cancer treatment at U.C. Davis. *Id* at ECF No. 1. After being interviewed by FBI agents she took refuge in the San Francisco Chinese consulate for approximately one month. *Id.* at ECF No. 13 at 3.   She subsequently left the Chinese consulate and went to a hospital where she was arrested upon discharge.   *Id* at 4.   Nonetheless, the court ordered that Ms. Tang's release pursuant to conditions, including a third-party custodian. *Id.* at ECF No. 61.  Ms. Tang's counsel successfully argued that:

> The government's baseless accusation that the Chinese consulate can and will assist
> Dr. Tang  in leaving the country … is belied by the fact that they: 1) did NOT get her

---

[16] U.S. Department of Homeland Security, Bureau of Customs and Border Protection, "Advance Passenger Information Systems Fact Sheet" (last modified November 12, 2013) available at https://www.cbp.gov/sites/default/files/documents/apis_factsheet_3.pdf (last viewed January 11, 2021).

[17] *See* Department of Justice, "Former U.C. Davis Researcher Charged with Visa Fraud and Making False Statements" (August 6, 2020) available at https://www.justice.gov/usao-edca/pr/former-uc-davis-researcher-charged-visa-fraud-and-making-false-statements (last viewed February 12, 2021).

[18] Leswing, Kif, "Chinese consulate in San Francisco is harboring a military-linked researcher wanted for visa fraud, FBI says, CNBC (July 22, 2020) https://www.cnbc.com/2020/07/22/chinese-consulate-in-san-francisco-harboring-fugitive-fbi-says.html (last viewed February 12, 2021).

out of the country at a time when it would have been lawful for her leave; 2) did NOT get her out of the country after the existence of a warrant was known when arguably there was more incentive for the PRC to assist her in leaving the country; and 3) did not keep her on consulate property at a time when they knew she would be arrested if she was off consulate property.  *Id.*  at ECF No. 14, pg. 2.

Similar reasoning applies here.  There is no reason to believe that even if Dr. Cheng could evade law enforcement and travel hundreds of miles as a fugitive from justice, that any Chinese consulate or embassy would take him in and allow him to remain indefinitely.  Ms. Tang is, the *only* example of *any* "China Initiative" defendant attempting to take refuge in a consulate which demonstrates this fear is unfounded.  The Government does not suggest that Dr. Cheng is in any way more remarkable or important to the Chinese government than Tang Juan or any other defendant on bond.  Ms. Tang was **not** even a U.S. Citizen and had fewer community ties than Dr. Cheng.  Dr. Cheng, like Ms. Tang, has a friend willing to act as a third-party custodian.  *See* § VI A, below.  There is also no reason to believe that Dr. Cheng desires to spend the remainder of his life confined to a diplomatic facility, even if one would have him.

### D.    Cash in Dr. Cheng's TAMU Office Does Not Indicate Flight Risk

The Government argued that a large amount of currency in Dr. Cheng's TAMU office evidences he is a flight risk. First, the Government refers to cash of $13,000, hardly an amount sufficient to indicate flight. Second, the fact that Dr. Cheng was arrested *returning* to the U.S. indicates he was not planning an escape. Third, the substantial financial resources the Government contends Cheng already has abroad undermine the theory that he would need a stash of cash to run.[19]The truth is more mundane.

Dr. Cheng was the victim of an advance fee fraud crime years ago.  Ashamed to admit this to his wife, rather than deposit the money, he cashed the restitution check.  He contends this was the

---

[19] Given that Dr. Cheng worked at TAMU's Qatar campus, it would be surprising if he did not have overseas

source of the currency in his office desk.[20]   The Government should have records verifying the source of these funds because currency transactions in excess of $10,000 are required to be reported to the U.S. Treasury pursuant to 31 U.S.C. § 5324.   This amount – which was seized - pales in comparison to Dr. Cheng's substantial financial ties to this District, which will secure his appearance.

### E.      Dr. Cheng Lacks Personal Characteristics that Indicate Flight

Dr. Cheng has no prior criminal history or history of drug abuse, alcohol abuse, or failure to appear at court proceedings.   *See* 18. U.S.C. 3142(g)(3).   This weighs in favor of release.   He has a stable mental condition which also weighs in favor of release.   Dr. Cheng has no known health conditions that would prevent him from appearing at future court dates.[21] More significantly, his history and characteristics relating to financial community ties demonstrate release is appropriate.

### F.      Potential Sentence Does Not Suggest a Serious Flight Risk

The statutory maximum punishment for each offense is five, twenty (each count), and five years (each count), respectively.   Consecutive sentencing is not mandatory. 18 U.S.C. § 3584(a). The record in this case does not suggest a maximum sentence or consecutive sentences would be appropriate or likely.   Instead, the counts would be grouped together for computation of an offense level under the United States Sentencing Guidelines.   *See* U.S.S.G. § 3D1.2.

The argument that Dr. Cheng faces a substantial term of imprisonment does not withstand scrutiny. Dr. Cheng has no criminal history.  Even under the Government's suggested application of § 2B1.1, including special offense characteristics and adjustments (which are debatable), a potential

---

accounts.

[20] Counsel requested the DOJ for any information relating to this restitution in the event it came through the federal system.

[21] Dr. Cheng was tested for COVID-19 on or about January 4, 2021, and was informed his results were positive on January 7, 2021. He also has several other chronic health conditions, such as hypertension, but none would preclude

guidelines sentence would be closer to five years than any higher statutory maximum. *See* U.S.S.G. § 2B1.1. Should Dr. Cheng plead guilty, the USSG range is even lower. U.S.SG. § 3E1.1. However, Dr. Cheng is also probation eligible by statute. 18 U.S.C. §§ 371, 1001, 1343, 3559, and 3561. An advisory guidelines sentence in this case is not high enough to weigh in favor of detention.

The Government further emphasized Dr. Cheng's potential fines and restitution obligations. Yet, the Government also acknowledged Dr. Cheng has substantial financial resources in this country. As discussed below, these assets weigh in favor of release and may be used to secure his appearance.

## V. Financial Resources

### A. Dr. Cheng Holds Substantial Real Estate in this District Demonstrating Community Ties Sufficient to Secure Appearance

Dr. Cheng's substantial ties to the Southern District of Texas are evidenced by his numerous personal relationships (See Ex. Below) and ownership of seven pieces of real property in in Brazos County, Texas:

| Real Property Address (College Station, TX) | Brazos Co. Appraisal Dist. 2020 Appraised Value[22] | Approx. Debt | Est. Equity |
|---|---|---|---|
| 2417 Norham Dr. | $298,306 | $0 | $298,306 |
| 715 Pasler | $291,916 | ($142) | $291,774 |
| 3610 Vienna Drive | $206,566 | ($64,165) | $142,401 |
| 3712 Dove Hollow Ln. | $240,341 | ($67,819) | $172,522 |
| 610 Hartford Dr. | $181,585 | $0 | $181,585 |
| 1007 Summer Court Cir. A-D | $284,895 | ($30,412) | $254,483 |
| 3805 Westfield Dr. | $186,927 | $0 | $186,927 |
| | | **TOTAL** | **$ 1,527,998** |

Although occupied, none of these properties is an exempt homestead. The Court may

his appearance at trial.

[22] Values available at Brazos Central Appraisal District, property search, at https://esearch.brazoscad.org/

require, and Dr. Cheng is willing, to pledge them as collateral to secure any bond as allowed by statute. 18 U.S.C. 3142(c)(1)(B)(xi) states that conditions of release may include that Dr. Cheng:

> (xi) execute an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value, including money, as is reasonably necessary to assure the appearance of the person as required, and shall provide the court with proof of ownership and the value of the property along with information regarding existing encumbrances as the judicial office may require;

If the Court agrees to set bail and allow property to secure his appearance, Dr. Cheng is willing to provide all required documentation to the Court.  An Agreement to Forfeit Real Property to Obtain Release relating to the three unencumbered properties signed by both Dr. Cheng and his wife pursuant to 28 USC 1746 is attached (Ex. A).  Agreements to forfeit these properties are regularly used by federal courts and may be combined with other conditions to reasonably assure Dr. Cheng's appearance in this case.[23]  The court may forfeit the property by these agreements and also under the provisions of Fed. R. Crim. Pro. 46(i) and 18 U.S.C. 3146(d) if he fails to appear.

The Cheng's jointly agree to forfeit the following property if Dr. Cheng fails to appear as required for any court proceeding or for the service of any sentence imposed.

1. 2417 Norham Dr., College Station, TX
   Appraised Value: $298,306
   **Debt: $0**
2. 610 Hartford Dr., College Station, TX
   Appraised Value: $181,585
   **Debt: $0**
3. 3805 Westfield Dr., College Station, TX
   Appraised Value: $186,927
   **Debt: $0**

---

(last viewed February 12, 2021).

[23] For example, the United States District Court for the District of Oregon has a "Procedure for Criminal Bonds Secured by Real Property" and forms, including a "Agreement to Forfeit Property" published on its website. https://www.ord.uscourts.gov/index.php/filing-and-forms/property-bond-forms-and-procedures (last viewed January 26, 2021).

The Cheng's are the properties' sole owners and they are not subject to any claim, lien, mortgage, or other encumbrance. They will promise not to sell, mortgage, or otherwise encumber the properties, or do anything to reduce their value while this agreement is in effect.

# VI. Community Ties

## A. Third-Party Custodian

As a condition of release, Dr. Dawei Luo has agreed to be Dr. Cheng's Third – Party custodian. Dr. Luo is a responsible person who has known Dr. Cheng since 2005. Dr. Luo lives in Katy, Texas.  If necessary, Dr. Cheng can live in Dr. Luo's home.

Dr. Luo, as custodian, will accept responsibility for doing everything in his power to ensure that Dr. Cheng complies with his conditions of Pretrial Release. Dr. Luo is pledged to report to Pretrial Services any violations of the Court's conditions of release. *See Declaration of Luo, Attached. (*Ex. B*)*.

## B. Numerous Friends and Colleagues are Willing to Guaranty Dr. Cheng's Appearance and Become Sureties

Dr. Cheng's numerous friends, former classmates, and former students continue to support him in his request for release. Most of these persons are United States citizens. All have established their livelihoods in the United States.  They stand by their submissions, signed under penalties of perjury, that they are willing to post bond as a guarantee of Dr. Cheng's appearance, to be a surety. These individuals include:

- Jiwei Wu, a citizen of the United States who has known Prof. Cheng for decades since they studied together in China. Mr. Wu is now a Vice President of State Street Corporation, and he is willing to act as surety for Dr. Cheng's appearance in court (Ex. C);

- Guangdong Liao, a lawful permanent resident of the United States who has also known Prof. Cheng since 1985. He helped found and is now the Chief Computer

Scientist of NetBrain Technologies. He is willing to act as surety against Prof. Cheng's appearance or to post a bond on his behalf (Ex. <u>D</u>);

- George Hu, a United States citizen who also met Prof. Cheng in about 1985, who lives in San Jose, California, where he is the Senior Director of Technology for the Kroger Corporation. He is also willing to act as a surety or post bond on behalf of Dr. Cheng (Ex. <u>E</u>); and

- Xudong Cheng (F-1), Mingxiang Zeng (F-2), Lecheng Zhang (F-3), Jun Wang (F-4), and Leibang Huang (F-5) who have also affirmed that their trust in Prof. Cheng is such that they will risk their own funds for his appearance in court as ordered.

Together with a bond secured by unencumbered real property, electronic monitoring, a curfew, and other conditions, this Court may order a combination of conditions that will secure Dr. Cheng's future appearances in this case.

**C.    Support From Long Time Colleagues**

Two long-time colleagues from Dr. Cheng's time at Princeton believe that he is no flight risk based on their dealings with him over the years. Professor Paul Chaikin oversaw Dr. Cheng as a graduate student. Dr. Meyer has known Dr. Cheng for three decades and supported his application for U.S. citizenship. Their letters of support are summarized as follows:

- Dr. Paul Chaikin. Professor Cheng was his graduate student while he was a professor in the physics department at Princeton University. Dr. Cheng received his PhD in Physics from Princeton in 1999. Dr. Chaikin also interacted with him when he was postdoc at Exxon Corporate Research Labs in Clinton, NJ, where he was a scientific consultant.

  Dr. Chaikin's credentials follow: tenured full professor of Physics at UCLA, the University of Pennsylvania, Princeton University, and presently at New York University. He is the Silver Winslow Professor of Physics at NYU, and the Smythe Professor of Physics, Emeritus at Princeton University. He was elected as a member of the U.S. National Academy of Arts and Sciences, the American Physical Society and the Institute of Physics (London). Dr. Chaikin has served on many National Academy and National Research Council committees. Dr. Chaikin can vouch for Professor Cheng's standing in the international scientific community. He respectfully recommends that the Court consider his release from incarceration while he awaits his trial and recovers from COVID-19. (Ex. <u>G</u>)

- Bill Meyer has known Dr. Cheng for three decades, and while he was studying at Princeton supported his application for U.S. citizenship, which was subsequently granted. Dr. Cheng's release on bail with an electronic ankle bracelet capable of tracking his location, would be no threat to society nor risk his scheduled court appearance. (Ex. H*)*

### D.        Community Support

There are a number of individuals from the wider community that are supportive of Dr. Cheng, though some do not know him personally. They wish to communicate to the Court that they stand by him but are concerned about the DOJ "China Initiative" and ask the Court to treat Dr. Cheng fairly by giving him the opportunity to properly defend himself and consider Pretrial Release.

As native Chinese speakers, they realize how hard it is to properly translate technological writings. These individuals are:

- Ping Xiang, has lived in College Station, TX for the last 10 years. He is on the faculty with the Department of Health and Kinesiology at TAMU. (Ex. I)

- Hu Zhao, DDS, Ph.D., has lived in the U.S. for the last 20 years. He is an assistant professor at TAMU, College of Dentistry. (Ex. J)

- Jian Feng, is a Chinese American biomedical researcher at TAMU. (Ex. K)

- Dr. Hong Zhang, a U.S. Citizen, has known Dr. Cheng through an alumni network as they were both graduates from the University of Science and Technology of China. Dr. Zhang was an associate professor at UT Southwestern Medical Center in Dallas before retirement. He is supportive of Dr. Cheng. (Ex. L)

- Quengsheng Wang has worked with Dr. Cheng at TAMU. Mr. Wang has known him as a good, caring friend for many years. He asks the Court to give him favorable consideration for his bond application. (Ex. M)

- Suzie Bush has been friends with Dr. Cheng for many years. She lives in College Station, Texas and offers her support. (Ex. N)

## VII.   Appropriate Combination of Conditions Exists to Secure Dr. Cheng's Pre-Trial Release According to the Facts, Law, and Similar Cases

The Courts in the case of Tang Juan and others crafted successful combinations of conditions which may be replicated in this case.  Dr. Cheng is confident that the Court can impose a

combination of conditions from those listed in 18 U.S.C. 3142(c)(1)(B) that would assure Dr. Cheng's appearance, including pledging real property to secure his appearance.

### A.      Similar Cases Where the Requested Conditions of Release Have Been Successful

Dr. Cheng's suggested standard conditions, including a bond secured by real property, a third-party custodian, and electronic monitoring, as well as less stringent combinations, have occurred in numerous other similar cases involving Chinese born professors and researchers caught up in the "China Initiative" without any record of flight or forfeiture.

#### 1.      United States v. Simon Saw-Teong Ang

University of Arkansas – Fayetteville professor Simon Saw-Teong Ang was the principal investigator on grants awarded by NASA. *United States v. Simon Saw-Teong Ang*, 5:20-cr-50029 at ECF No. 1 (W.D. Ark. May 8, 2020). [24]  He was arrested for Wire Fraud as he allegedly failed to disclose affiliations with companies and programs in China. *Id.* He has since been indicted for forty-two counts of Wire Fraud for grants in excess of $2.4 million and two counts of False Statements in Application and Use of a Passport. *Id.* at ECF No. 15.  Prof. Ang was released pursuant to an order setting conditions of release, including the execution of a $200,000 bond secured, in part, by real property. *Id.* at ECF No. 12.  Ang and others signed a "Forfeiture Agreement" whereby the real property pledged would be forfeited in the event Ang failed to appear, which he has not. *See Id.* at ECF No. 13.

#### 2.      United States v. Feng Tao

Similar to Ang and Defendant, Feng Tao, an associate professor at the University of Kansas ("KU"), allegedly failed to disclose to KU his employment as a professor in a "talent program" with

---

[24] *See* Department of Justice, "University of Arkansas Professor Indicted for Wire Fraud and Passport Fraud" (July 29, 2020) available at https://www.justice.gov/opa/pr/university-arkansas-professor-indicted-wire-fraud-and-passport-fraud (last viewed February 12, 2021).

Fuzhou University in China. [25] *United States v. Feng Tao,* 2:19-cr-20052-JAR at ECF No. 1 (Dist. Kan. August 21, 2019). Because he concealed this conflict of interest, the Government contends he was able to maintain his employment with KU and have continued access to U.S. government grants or contracts. *Id.* Indicted for wire fraud and program fraud relating to grants from the Department of Energy and National Science Foundation, Tao was released on bond. *Id.* at ECF No. 10. As a condition of release, he posted real property as collateral and signed a "Forfeiture Agreement" filed with the Court. *Id.* at ECF No. 9.

### 3.    *United Sates v. Anming Hu*

Anming Hu, a Canadian citizen and University of Tennessee professor performed research under Department of Energy and NASA grants.  He also allegedly failed to disclose a faculty position at a Chinese university. [26]   *See United States v. Anming Hu,* 3:20-cr-00021-TAV-DCP at ECF No. 1 (E.D. Tenn. February 25, 2020).  As a result, he, too, was indicted for Wire Fraud and False Statements. *Id.*  Although the Government sought his detention on the basis of a "serious flight risk," Hu was released.  *Id.* at ECF No. 15.  Similar to Dr. Cheng, Hu's wife and two of their children live abroad, Hu had frequent travel to China, was an alleged member of the China Talent Plan, and had foreign bank accounts.  *Id.*  Nevertheless, Hu was released with conditions including home detention and electronic monitoring. *Id.* at ECF No. 14-15.

### 4.    *United States v. Qing Wang*

Likewise, Dr. Qing Wang, a naturalized U.S. citizen, researcher with the Cleveland Clinic,

---

[25] *See* Department of Justice, "University of Kansas Researcher Indicted for Fraud for Failing to Disclose Conflict of Interest with Chinese University" (August 21, 2019) available at https://www.justice.gov/opa/pr/university-kansas-researcher-indicted-fraud-failing-disclose-conflict-interest-chinese (last viewed February 12, 2021).

[26] *See* Department of Justice, "Researcher at University Arrested for Wife Fraud and Making False Statements About Affiliation with a Chinese University" (February 27, 2020) available at https://www.justice.gov/opa/pr/researcher-university-arrested-wire-fraud-and-making-false-statements-about-affiliation (last viewed February 12, 2021).

and professor at Case Western Reserve University is also charged with false claims and wire fraud.[27]

*United State v. Qing Wang,* 1:20-mj-09111-WHB at ECF No. 1 (N.D. Ohio May 12, 2020).  Like Defendant and others, these allegations arose from his failure to disclose his affiliations with a university in China, foreign grant support, and participation in the "Thousand Talents Program," related to grants from the U.S. Government (NIH).  *Id.* Wang was released on an unsecured $100,000 bond.  *Id.* at ECF No. 8 and 9.

### 5.    United States v. Gang Chen

MIT professor Gang Chen, a naturalized U.S. Citizen, was recently arrested on charges similar to Defendant.  His indictment alleges Wire Fraud, Failure to Report Foreign Accounts and False Statements. *United States v. Chen,* No. 1:21-cr-10018-PBS at ECF No. 12 (N. D. Ca. January 19, 2021). The purported loss amounts in that case are $21.2 million, much higher than the $662,045 in this case.  *Id.* at ¶¶2-3. Nevertheless, Gang Chen was released without any security or unusual conditions.  *See Id.* at ECF 11.

### 6.    U.S. v. Chen Song

Chen Song, a Chinese citizen, is accused of lying about her affiliation with the Chinese military when applying for a visa to come to the United States as a visiting neurology research scholar at Stanford University.[28] *United States v. Chen Song*, 3:20-mj-70968 at ECF No. 1 (N.D. Cal. July 17, 2020). Ms. Song was released on a bond secured by property in the amount of $100,000. *Id.* at ECF No. 6.  Recently, the court removed the requirement of electronic monitoring but increased the amount of the bond security to $250,000. *Id.* at ECF No. 38, 43, 44.  She, like the

---

[27] *See* Department of Justice, "Former Cleveland Clinic Employee and Chinese "Thousand Talents" Participant Arrested for Wire Fraud" (May 14, 2020) available at https://www.justice.gov/opa/pr/former-cleveland-clinic-employee-and-chinese-thousand-talents-participant-arrested-wire-fraud (last viewed February 12, 2021).

[28] Department of Justice, "Visiting Stanford University Researcher Charged with VISA Fraud" (July 20, 2020) available at https://www.justice.gov/usao-ndca/pr/visiting-stanford-university-researcher-charged-visa-fraud (last viewed

above defendants, has yet to flee.

### 7.      *United States v. Hao Zhang*

Chinese professor Hao Zhang flew to Los Angeles in 2015, for a conference and was arrested for conspiring with others to commit Economic Espionage and Theft of Trade Secrets, and also committing both. *United Sates v. Pang et al,* No. 5:15-cr-00106-EJD at ECF No. 1 (N.D.Ca February 18, 2015). Mr. Zhang, despite being an alien subject to deportation, was released on conditions including a $500,00 bond secured by properties and electronic monitoring. *Id.* at ECF Nos. 19, 21, 23 24 25  38, 43, 66. After a bench trial, Zhang was convicted of 23 counts and sentenced to 18 months imprisonment followed by three years supervised release and ordered to pay $476,834 in restitution.  *Id.* at ECF No. 351.

### 8.      *United States v. Tang Juan*

Finally, Ms. Tang Juan, discussed above,[29] is accused of lying about her affiliation with the Chinese military when applying for a visa to come to the United States to study cancer treatment at U.C. Davis. *United States v. Tang Juan*, 2:20-cr-00134-JAM at ECF No. 18 (E.D. Ca. June 26, 2020). Despite having taken refuge in the Chinese consulate after being interviewed by FBI agents. The court ordered  Ms. Juan  released pursuant to conditions including a third-party custodian and $750,000 bond secured by property. *Id.* at ECF No. 61.

These "China Initiative" cases demonstrate that the Court may order a combination of conditions that will reasonably assure Dr. Cheng's appearance.  None of these – and no other "China Initiative" Defendant has fled after release.

---

February 12, 2021).

[29] *See* Department of Justice, "Former U.C. Davis Researcher Charged with Visa Fraud and Making False Statements" (August 6, 2020) available at https://www.justice.gov/usao-edca/pr/former-uc-davis-researcher-charged-visa-fraud-and-making-false-statements (last viewed February 12, 2021).

## VIII. Continued Detention Inhibits Effective Assistance of Counsel

### A. Evidence is Voluminous and Complex

The Government successfully moved to certify this case complex for reasons that demonstrate both due process and the right to effective assistance of counsel demand Dr. Cheng's release. *See* ECF Nos. 19 and 21. As stated in that motion, authorities seized numerous electronic devices including a cell phone, computers, hard drives, USB storage devices, and tablet computers. ECF No. 19, pp. 2-3. From those,

> "There are over 2,242,640 files of digital evidence to review. This digital evidence was obtained after the defendant's arrest and much of the evidence is in a foreign language. Not only is the sheer size of the electronic evidence complex, linguists will need to translate the evidence." - ECF No. 19, p 3.

This is true for both parties, not just the prosecution. The complexities of this evidence require Dr. Cheng's release to assist in his own defense. The submission in the motion that "it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limit established by the Speedy Trial Act," is more true for Dr. Cheng than for the Government. The case agents have presumably worked on this case for a prolonged period leading up to indictment, are not incarcerated, and have the United State's full resources supporting their efforts, whereas Dr. Cheng is in custody with only his defense team to rely on.

The evidence in this case is voluminous. The electronic discovery has yet to commence, which is considerable. The Government has provided approximately one dozen binders of printed discovery materials. Many of these are in Chinese. Although the prosecution has stated it will provide translations it performs, it will not translate everything. Defense counsel (neither of whom speak or read Chinese) must review the evidence with the Defendant to render effective assistance of counsel and/or have these materials translated. Detention makes it very difficult, if not impossible, to

21

safely review the evidence with Dr. Cheng on account of the pandemic detention conditions.

Dr. Cheng, while incarcerated, is not available to effectively communicate with his counsel to explain e-mails, documents, or text messages in an efficient or timely manner.  He must be consulted intermittently, at best, at the Federal Detention Center (currently closed for visitation due to Covid-19) or, as made necessary by current conditions, in an online video meeting scheduled in advance.    To prepare such a case and render effective assistance of counsel, even after the Government finally produces all the evidence it will take months or years to review, will demand even lengthier delays, and further prolonged detention of the accused.  This challenge is even greater due to the language barrier in the evidence.

### B. Substantial Amount of Evidence in Chinese

As noted, substantial amount of the Government's evidence is in Chinese. It would be untenable to effectively work through the evidence with Dr. Cheng if he remains detained. Random samples of the Chinese evidence documents are attached (Ex. O). Many of the thousands of pages of documents are scientific in nature requiring give and take with legal counsel even if in English. Providing Government translation is not the answer. Perhaps, Ms. Liu, an attorney, best addresses the difficulties in working through Chinese-English translations, particularly for detained individuals.

Ms. Liu is an intellectual property attorney in California, who studied physics as an undergraduate.  Declaration of Liu, (Ex. P).  She has litigated several cases where accurate and complete translation of documents from Chinese to English is critical.  *Id.* She is fluent in Mandarin and English. *Id.* The majority of the cases that she participated in were civil litigation such as civil trade secrets litigation. *Id.*  However, she has also assisted in white-collar criminal cases. For that reason, she also visited criminal defendants in Federal Detention Centers.  *Id.*

Ms. Liu states that the accuracy of the translated technical terms is critical to understanding the true meaning of the document. *Id.* She describes an example in her attached Declaration. *Id.* Ms. Liu addresses that accurate understanding is critical to intent and understanding what the Chinese speaker actually meant. *Id.* Ms. Liu also addresses the crucial need to understand context. A selected translation of a document could be very misleading. *Id.* This is why it is important to work closely with the client when reviewing documents in Chinese.

With these in mind, Ms. Liu believes that giving Dr. Cheng the chance to converse freely and frequently with his counsel in person will greatly help his defense. *Id.* Counsel can appreciate the accurate and nuanced meaning of the evidence much better therefore provide a good defense. *Id.* Ms. Liu visited Federal Detention Centers and knows that even when attorneys could visit the defendants (before the pandemic), the process can be cumbersome. *Id.* Counsel, typically, cannot bring laptops into the detention center. *Id.* This will further encumber the ability of counsel to revisit in a meaningful way documents and preclude accessing documents from his law firm. *Id.* Based upon her experience, *it* would be almost impossible for Dr. Cheng to compare a Chinese document and an English document on a small computer screen without access to printers, especially if he has limited access to a computer or internet. *Id.*

## IX. Pretrial Report Recommended Release; Dr. Cheng's Proposed Enhancements

The Pretrial Services Report (ECF No. 8) and its Addendum (ECF No. 9) both recommended bond. We urge the Court to accept the recommendations but with the below added enhancements to make release ever more restrictive to reasonably secure appearance.

| PRETRIAL REPORT RECOMMENDATIONS | PROPOSED ENHANCEMENTS |
|---|---|
| 1. $50,000 Unsecured Bond | 1. A) The Chengs agree to forfeit 3 debt free properties located in College Station, TX with |

| | a combined appraised value of $666,818.00 |
| | B) Dr. Cheng's agreement to live with a custodian (Dr. Dawei Luo of Katy, Texas or suitable substitute) who will assure compliance with the court ordered conditions of release and conditions imposed by the Probation Office. |
| | C) Surety who will post $50,000 Unsecured Bond. |
| 2. Pretrial Services Supervision. | 2. (SAME) |
| 3. Maintain or actively seek verifiable employment. | 3. (SAME) |
| 4. Obtain no passport/ Surrender passport | 4. Passport already in possession of U.S. Government. Will not seek to obtain replacement. |
| 5. Travel restricted to Southern District of Texas. **Outside travel to be pre-approved by the Court.** | 5. A) travel restricted to the following Texas Counties: Harris, Ft. Bend, Brazos, Grimes and Waller.<br><br>B) Curfew: 10:30P.M. until 6:00A.M. |
| 6. Avoid all contact with co-defendant, victims or potential victims. | 6. (SAME) |
| 7. Refrain from possessing a firearm, destructive device, or other dangerous weapons. | 7. (SAME) |
| 8. Refrain from excessive use of alcohol. | 8. (SAME) |
| 9. Refrain from use or unlawful possession of a narcotic drug or other controlled substance unless prescribed by a licensed medical practitioner. | 9. (SAME) |
| 10. Participate in an electronic monitoring program as directed by the U.S. Probation Office and pay costs associated with such monitoring based on the ability to pay as determined by the U.S. Probation Office. To Include: **Stand-Alone Monitoring (With Active GPS monitoring).** | 10. (SAME) |
| 11. Report Contact with Law Enforcement | 11. (SAME) |

# X. CONCLUSION

Dr. Cheng humbly requests the Court to release him pending trial and imposition or execution of a sentence, if necessary. There is no credible reason, let alone a preponderance of the

24

evidence, that he is a serious flight risk and no combination of conditions will secure his appearance.

Dr. Cheng requests the Court to grant this Motion, revoke the detention order, set this matter for a hearing, and release him upon appropriate conditions.

Respectfully Submitted,

**HILDER & ASSOCIATES, P.C.**

/S/ *Q. Tate Williams*
Quentin Tate Williams
Texas Bar No. 24013760
Philip H. Hilder
Texas Bar No. 09620050
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
tate@hilderlaw.com
philip@hilderlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon the Assistant United States Attorney for the government herein, via ECF contemporaneous with filing.

/S/ *Q. Tate Williams*
Quentin Tate Williams

## CERTIFICATE OF CONFERENCE

We communicated by electronic mail and/or by telephone with AUSA Mark McIntyre and Carolyn Ferko and they related that they are opposed to the relief requested.

/S/ *Q. Tate Williams*
Quentin Tate Williams

/S/ *Philip H. Hilder*
Philip H. Hilder