# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | Criminal No. 4:20-cr-00455 |
| | § | |
| ZHENGDONG CHENG | § | |

## DEFENDANT'S OPPOSED MOTION TO SUPPRESS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ANDREW S. HANEN:

ZHENGDONG CHENG, Defendant, ("Cheng") moves to suppress his August 23, 2020, interrogation and any oral or written statements, consent to search electronic devices and all evidence obtained therefrom in violation of the 5th and 14th Amendments to the U.S. Constitution and shows:

## I. INTRODUCTION

Dr. Cheng was arrested at the College Station, Texas airport by federal agents on August 23, on his return from Doha, Qatar, 2020, a seventeen hour, two flight journey. The arrest came three days after a complaint was filed and arrest warrant issued in this case. *See* Dkt. 1. Shortly after Cheng was taken into custody, Cheng was *Mirandized*, but told he was not under arrest. Cheng invoked his right to counsel. Nevertheless, the agents persisted. They told Cheng he was not free to leave and that if he insisted on counsel he would be jailed. After Cheng's initial request for counsel was ignored, he cooperated only because he believed that he would otherwise be jailed. The agents succeeded in ultimately securing a written "consent" to answer questions, which Cheng did, incriminating himself orally and in writing. Cheng also signed a consent to search his electronic devices after being told they would be returned in fifteen minutes. They were not. The agents made

1

an audio-visual recording of these events.

This conduct violates Cheng, a U.S. Citizen's rights under the 5th Amendment to the U.S. Constitution. All evidence obtained as a result of these violations must be suppressed and excluded from the trial of this case or any other purpose against him.

## II.     Relevant Facts

The material facts relating to this motion are not subject to dispute. They were preserved in an audio-visual recording made by federal agents and provided to Cheng in discovery. *See* Ex. A.[1] The three documents executed by Cheng on that recording were also produced. *See* Ex. B, C, and D. Some facts are already in the record. *See* [ECF No. 1](#), [No. 12](#), and [No. 26](#). This recitation is derived from those materials.[2]

On August 20, 2020, a "Complaint" was filed in this case charging Cheng with Wire Fraud, False Statements, and Conspiracy. [ECF No. 1](#). Included was a twenty-three page "Affidavit in Support of Criminal Complaint and Arrest Warrant" sworn to by FBI Special Agent Benjamin Harper. *[Id.](#)* As a result of that pleading, an arrest warrant was issued that day. [ECF No. 12](#).[3] It was returned as executed on August 23, 2020, the day of Cheng's interrogation. *[Id.](#)*

---

[1] Exhibit A is a 1 TB portable hard drive containing the five video files comprising the interview in sequential order as produced by the Government. (MVI_0020.MP4, MVI_0021.MP4, MVI_0022.MP4, MVI_0023.MP4, MVI_0024.MP4, MVI_0025.MP4). Each of the video recordings is approximately thirty-three minutes long, except the last, which is much shorter. The majority of events relevant to the suppression issue are in the first nine minutes of the first video, MVI_0020.MP4. The actual drive accompanies the chambers copy of the motion while only a photograph has been e-filed.

[2] Defendant is not available to counsel to sign a declaration or affidavit because he is in quarantine at the Federal Detention Center – Houston, as a COVID-19 precaution. As soon as Cheng is released from Quarantine or the signed declaration returned by mail, an executed declaration will be supplemented to this motion. The unsigned declaration sent to Cheng for execution was drafted with his participation and affirmation to undersigned counsel of its veracity is attached as Exhibit "E." Cheng gave undersigned counsel permission to sign on his behalf, but counsel believes that would have no legal effect.

[3] The arrest warrant is not publicly available on PACER. However, the form for use in U.S. District Courts (AO 442 (Reve. 11/11)) begins "To: Any authorized law enforcement officer YOU ARE COMMANDED to arrest and

On August 23, 2020, Cheng was detained at the Easterwood Airport in College Station, Texas, upon his return from Qatar. ECF No. 12; ECF No. 26 at 50:20-23, 44:24-25, 45:1-8. Cheng had just completed an almost sixteen hour international flight, followed by a short lay over, and second brief domestic flight. *See* Ex. F.[4] There, federal agents took Cheng to a room for questioning. The agents identified themselves as FBI Special Agent Mike Collier and NASA-OIG Special Agent Todd Angle. They then advised Cheng of his *Miranda* rights. *Id.* at 50:24-25; Ex. B. While doing so, Special Agent Collier told Cheng he was not under arrest, despite Collier's knowledge that an arrest warrant had been issued "commanding" Cheng's arrest and the duty to execute it. After the *Miranda* warnings Cheng unequivocally invoked his right to counsel. That exchange was as follows:

| | |
|---|---|
| **FBI SA:** | Yes. Yes. OK, so like I said, I'm Mike Collier with the FBI. This is my partner, Special Agent Todd Angle. OK, I'm sure you got a lot of questions. Why is the FBI stopped me in the airport to ask me questions, right? |
| **Cheng:** | Yeah |
| **FBI SA:** | We have a couple questions, too, but because you're speaking with law enforcement, you have to understand your rights. Okay? |
| **Cheng:** | Yeah |
| **FBI SA:** | We're going to go over a little sheet here. Already dated it. Let's just, I'm read this for you, OK? OK, so it just says before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you can say can be used against you in court. You have the right to talk to a lawyer for advice before we ask any questions. You have the right to have a lawyer present with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide |

---

bring…" available at https://www.uscourts.gov/sites/default/files/ao442.pdf. (last viewed May 13, 2021).

[4] Exhibit F is a copy of Cheng's airline ticket receipt. It should also be noted that Doha, Qatar (Arabia Standard Time) is eight hours ahead of College Station, Texas (Central Standard Time).

>       to answer questions now, without a lawyer present, you have the right
>       to stop at any time. Now you're not under arrest. But we say this
>       because you're talking to law enforcement.

> **Cheng:** I, Can you tell me why you?

> **FBI SA:** I, Yeah, I absolutely can, But,

> **Cheng:** **But I, I, if you have you can get a lawyer, I want to have a lawyer present.**

> - Ex. A (MVI_0020.MP4 at time stamp 0:00:20 – 01:27).

The agents ignored Cheng's request for counsel and continued the discussion, making clear that Cheng was not free to leave when Cheng asked to go to his hotel. Collier repeated Cheng was detained, which Collier described as obvious, but not arrested:

> **FBI SA:** You are absolutely. But we just can't talk to you if you do that right now. We can't answer your question right now, sir.

> **Cheng:** But can I go to hotel?

> **FBI SA:** Uhm well, **Well, no.**, because **you're obviously being detained right now** because we stopped you before you came out, **but you're not under arrest.**

> **Cheng:** Uh-huh

> - Ex. A (MVI_0020.MP4 at time stamp 0:01:28 – 0:01:44).

Moments later, Cheng inquired about his ability to leave. But, Special Agent Collier told Cheng again that he was detained and "not free to go to the hotel." The agent implied that Cheng could leave after questioning by emphasizing that it would not take long, a consistent theme throughout the entire colloquy.

> **Cheng:** So if I ask a lawyer right now…

> **FBI SA:** uh huh

4

| | |
|---|---|
| **Cheng:** | …can I go to the hotel? |
| **FBI SA:** | **You're not, you're being detained right now, OK, you can't you're not free to go to the hotel.** Okay. Uhm you know, hopefully this won't take very long. We can try to make it quick. |
| **Cheng:** | Uh-huh |

- Ex. A (MVI_0020.MP4 at 0:02:08 – 0:02:26).

Shortly thereafter, Special Agent Collier finally revealed the existence of the arrest warrant and told Cheng that he could not call anyone until *after* questioning. In that regard, Cheng's questions and the agents' answers were:

| | |
|---|---|
| **Cheng:** | What are the consequences? |
| **FBI SA:** | What are the consequences? Oh, well so, it all depends on how you answer the questions. Uhm, you know, I |
| **Cheng:** | Is, is this serious? |
| **FBI SA:** | It's very serious. It's very serious. Uhm, you know, there is an arrest warrant for you that has been issued. |
| **Cheng:** | Arrest warrant? |
| **FBI SA:** | Yes, sir. Yes, sir. But what I'm if you're willing to talk with us, I'm willing to listen. And maybe this is not as serious as we think it is. Okay? Does that make sense? Maybe you can clear up some confusion for us. |
| **Cheng:** | Can I call Dean first? |
| **FBI SA:** | After. No, you can't, **you can't call anybody right now**. |
| **Cheng:** | Why, because the Dean arranged this trip for me? |
| **FBI SA:** | He arranged.. |
| **Cheng:** | she.. |

| | |
|---|---|
| **FBI SA:** | She arranged this trip for you? |
| **Cheng:** | Yeah. |
| **FBI SA:** | **You can, you can make calls afterwards.** Uhm, It's completely up to you. We want your cooperation in our investigation. We need your cooperation. |
| **Cheng:** | But, I don't understand that this is the first time… |
| **FBI SA:** | Yes. |
| **Cheng:** | …I run into this kind of situation, right |
| **FBI SA:** | I understand. I understand. |
| - | Ex. A (MVI_0020.MP4 at 0:03:52 – 0:4:56 ) |

Cheng subsequently explored his rights and ability to leave again. The agents told Cheng that if he wanted an attorney, they could not talk "today" and "you'll be going to jail" then described the waiver of Constitutional rights as a "procedure" or "formality." Their exact words were:

| | |
|---|---|
| **Cheng:** | **And if insist to have a lawyer help me…** |
| **FBI SA:** | **Yeah** |
| **Cheng:** | **… if if we cannot get today, what what will happen?** |
| **OIG SA:** | **You'll be going to jail.** |
| **FBI SA:** | Here, here's the thing. So, um yeah it… |
| **Cheng:** | I'm not refusing, right? **I just need some help…** |
| **OIG SA:** | If you want an attorney that's your right |
| **FBI SA:** | Yes |
| **Cheng:** | **Yeah** |
| **FBI SA:** | Absolutely |
| **OIG SA:** | And we're not depriving you of that… |

| **FBI SA:** | Uh-huh |
|---|---|
| **OIG SA:** | …If that's what you want.. |
| **FBI SA:** | Uh-huh |
| **OIG SA:** | …that's fine… |
| **FBI SA:** | Yes |
| **OIG SA:** | …**but if you want an attorney, we can't talk today**… |
| **FBI SA:** | No |
| **OIG SA:** | …And the reason why we want to talk today is we want to kind of sort through a couple of things. Like he said, |
| **FBI SA:** | Mm-hm |
| **OIG SA:** | **.**…you know, like he had said we have an arrest warrant for you. Uhm, we think that you can provide a lot of clarity... |
| **FBI SA:** | Absolutely |
| **OIG SA:** | …we think that…. |
| **Cheng:** | But that is because [inaudible] |
| **OIG SA:** | we think that… |
| **Cheng:** | …I don't know, right our university is over there… |
| **OIG SA:** | …so there's its a procedural matter. Right. |
| **FBI SA:** | It is |
| **OIG SA**: | …this is the formality of it. |

- Ex. A (MVI_0020.MP4 at 0:05:37- 06:27)

Later, Cheng repeated his previous request to talk to the university and was, again, told by he could not. Cheng, finally, then executed the "consent" portion of the "Advice of Rights" form. Ex.

B. This final exchange was:

> **Cheng:** **I guess I want to talk to our university first.**
>
> **FBI SA:** Yeah
>
> **OIG SA:** **Yup, you can't do that.**
>
> **FBI SA:** Mm-hmm
>
> **OIG SA:** **So that's not going to happen.** So it's either you want to talk to us and sort through this and we can we can talk it through, or not.
>
> **FBI SA:** **You'll just sign your name right there, and then I'll witness it.** Awesome, thank you. I wore gloves so that you'll feel comfortable.
>
> **Cheng:** I don't have gloves.
>
> **FBI SA:** And the time is six seventeen p.m. He and you go, sir. Allright, So, I'll just cut through the chase, get right to the questions because you're a busy man and I know you just came off of a flight. So basically, all we want to do is clear up your Chinese affiliations and your Chinese employment activities, right. For instance, I know in 2011…[interrogation continues]
>
> - Ex. A (MVI_0020.MP4 at 0:07:39 – 0:08:37).

After Cheng finally submitted, signing the written "consent," the interrogation continued for approximately two hours. Ex A; Ex. B; ECF No. 26 at 51:1-3. During this, Cheng made numerous oral and written inculpatory statements. Ex. A, Ex. C. Numerous admissions were described by and relied upon by the Government's witness at Cheng's detention hearing. *See* ECF No. 26 at 32:21-25 to 38.

Near the end of the custodial interrogation, Cheng also signed a written consent to search the electronic devices in his possession. Ex. D. During the lengthy discussion prior to his signing that document, Cheng was told "you can't send any messages to people right now while we're in this room" and "don't respond to any messages currently" Ex. A (MVI_23.MP4 at 0:10:13-0:10:16 and

0:10:41-0:10:43). Cheng conditioned this consent on the devices' return within fifteen minutes because he believed he would be released after questioning and needed it. Ex. A (MVI_0023.MP4 at 0:06:25-0:06:33, 0:17:12-0:18:10), Ex. D, and Ex. E. Despite this condition, the devices were not returned to Cheng, who was arrested. They remain in federal custody.[5]

Finally, Special Agent Collier announced the interview was over. Ex. A (MVI_0024.MP4 at 0:01:24). Cheng was handcuffed, but never expressly told he was under arrest. Ex. A. (MVI_0024.MP4 at 0:04:38). Cheng was and transported to the Bureau of Prisons Federal Detention Center in Houston, Texas.

### III. Argument and Authorities

**A. The Evidence Should be Suppressed Because Cheng Unequivocally Invoked His Right to Counsel**

**1. A Clear Invocation of Counsel Terminates Custodial Interrogation**

" [A]n accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). If the subject of a custodial interrogation invokes his right to counsel, law enforcement officers are required to stop the questioning "until counsel is made available unless the suspect himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485-86, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The suspect must "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

---

[5] As the Court is aware from on the record discussions regarding pre-trial release and scheduling these

9

"Under *Miranda* and *Edwards,* however an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request for counsel." *Smith v. Illinois*, 469 U.S. 91, 92 (1984) 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Generally, an invocation by a suspect of his right to counsel that is ignored by law enforcement officers requires that the suspect's statements made after the request be excluded by the trial court. *Edwards v. Arizona*, 451 U.S. at 485-86.

### 2. Cheng Was Subject to Custodial Interrogation

A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *United States v. Chavira*, 614 F.3d 127, 132 (5th Cir. 2010)(citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 1612, 16 Ed.2d 1694 (1966)). "The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of a degree associated with formal arrest." *Id*. at 133 (citing *United States v. Bengivenga,* 845 F.2d 595 (5th Cir. 1988)(en banc)). The test is "how the reasonable man in the suspect's position would have understood the situation." *Chavira*, 614 F.3d at 132. This is "an objective inquiry that depends on the 'totality of the circumstances.'" *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *United States v. Wright*, 777 F.3d 769, 774-75 (5th Cir. 2015)). "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Wright* at 774-75 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)).

The Fifth Circuit has "identified factors relevant to the custody inquiry… (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-

---

devices remain in the custody of the Government. *See also* ECF No. 19 at pp. 2-3.

accusatory nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave." *United States v. Romero-Medrano*, 207 F.Supp.3d 708, 711-12 (S.D. Tex. 2016) (citing *Wright*, 777 F.3d at 775). "No one factor is determinative." *Id.* All weigh decidedly in favor of demonstrating Cheng was subject to custodial interrogation.[6]

Addressing each of the *Wright* factors in turn, the evidence in the video recording proves that: 1) Cheng was questioned for approximately two hours. 2) This interrogation occurred at an unknown location at the Easterwood Airport in College Station, Texas. 3) During the interrogation, two federal agents repeatedly made specific accusations that Cheng failed to disclose his affiliations with Chinese universities and companies to Texas A&M, employment contracts, and asked him about specific documents, all of which was the subject of the criminal Complaint giving rise to the warrant. When Cheng failed to answer, agree with their interpretation of events, or explain, the agents often interrupted Cheng, contradicted him or re-characterized his words. 4) While Cheng was not handcuffed until afterwards, Cheng was seated in a closed room with two federal agents. 5) During the interrogation, Cheng was expressly told each of the following by agents at least twice: a) Cheng was detained; b) Cheng was not free to leave; c) that there was a warrant for Cheng's arrest; d) Cheng could not call anyone; e) Cheng could not message anyone from his electronic devices. Objectively, no reasonable person in these circumstances would have considered themselves free to leave. Cheng did not, either. It was, therefore, a custodial interrogation.

---

[6] A defendant has the burden of proving he or she was under arrest or in custody. *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985) (internal citation omitted).

### 3. Cheng Invoked Right to Counsel Seconds After *Miranda* Warnings

The recording of the two-hour interrogation further demonstrates Cheng unequivocally invoked his right to counsel immediately after receiving *Miranda* warnings stating, "[b]ut I, I, if you have you can get a lawyer, I want to have a lawyer present." Ex. A (Video "MVI_0020.MP4" at 0:01:25-0:1:32). Yet, the agents continued the discussion in attempt to get Cheng to waive his rights and confess. They began, "[y]ou are absolutely. But we just can't talk to you if you do that right now. We can't answer your question right now, sir." (Video "MVI_0020.MP4" 0:02:35). This was calculated to change Cheng's mind. Shortly thereafter, Cheng told them "…so what I need to have a lawyer help me." Ex. A (Video "MVI_0020.MP4" at time stamp 02:35). Again, rather than respect Cheng's assertion of his Constitutional rights and terminate the interview, the agents persisted.

### B. The Evidence Should be Suppressed Because any Alleged Waiver of Cheng's Rights Was Not Knowing and Voluntary

The alleged waiver of Cheng's *Miranda* rights was not knowing and voluntary. Statements made during a custodial interrogation are inadmissible unless the government "can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Beghuis v.Thompkins,* 560 U.S. 370, 382 (2010)(quoting *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). The burden of proof rests on the Government to prove a valid wavier by a ponderance of the evidence. *United States v. Rojas-Martinez*, 968 F.2d 415, 417-18 (5th Cir.1992) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69). "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Beghuis* at 560 U.S. 382-83 (citing *Miranda* at 475). "The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *United States v. Cardenas*,

410 F.3d 287, 293 at fn. 25 (5th Cir. 2005) (citing *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004)).

A valid waiver has two components. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Cardenas*, 410 F.3d 287, 293 at fn. 23 (Fifth Cir. 2005) (internal citation omitted). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. Both components are absent from in Cheng's putative waiver according to the evidence.

Cheng unequivocally asked for an attorney. Had the interrogation ceased at that time, there would have been no subsequent written "consent." As recognized by the Supreme Court, "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474. "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice." *Id.* "If the individual states he wants an attorney, the interrogation must cease until an attorney is present." *Id. see also Michigan v. Mosley*, 423 U.S. 96, 101-04, (1975) (citing the "right to cut off questioning" as a "critical safeguard" against coercion). The agents did not cease interrogating Cheng, despite his request for counsel. Instead, they compounded that error with their subsequent conduct.

They deceived Cheng about the consequences of both asserting his rights and waiving his rights. The agents misled Cheng into believing he would be released if he spoke to them. At the same time, they told Cheng that he would go to jail if he persisted in his request for counsel. Had Cheng known he would not have been released regardless after waiver, he would not have signed the

form. Ex. E. Because of what the agents said, Cheng believed that the only way he would be released, instead of arrested, was if he cooperated with the agents. Ex. E. Moreover, when Cheng *twice* expressly asked about "consequences," the agents misled him. The first time, one replied "Oh well, so, it all depends on how you answer the questions. Uhm, you know, I." Ex. A (at MVI_0020.MP4 at 0:03:52 – 0:043:03). The second time, they did not answer Cheng at all. Instead, Special Agent Angle replied "[s]o I'm trying to understand the question" before passing it to Special Agent Collier, who did not answer Cheng either. Instead, Collier told Cheng they have "a lot" of questions and answers for each other. Ex. A. (MVI_0020.MP4 at 0:06:56 – 0:07:12). Cheng clearly did not understand the consequences of abandoning his rights and submitting himself to custodial interrogation. This lack of understanding was not organic, but, as the recording proves, the results of what the agents explicitly and implicitly communicated to Cheng. Because neither prong can be met, any waiver was neither knowing nor voluntary and must be suppressed.

Likewise, the "Consent to Search Computer(s)" obtained near the end of Cheng's custodial interrogation was also involuntary. *See* Ex. D. As with the other "consent" form, it occurred during the impermissible continuation of interrogation after Cheng invoked his right to counsel. Furthermore, Cheng was deceived into believing that his devices would be returned to him in "fifteen minutes" and that he would be free to leave with them immediately thereafter. In fact, the devices were not returned to him and never would be that day as the agents had an arrest warrant for Cheng which they intended to, and did, execute. Had Cheng known the devices would not be returned or he allowed to leave, Cheng would not have signed the consent form. Ex. E. It, and the results obtained from this "consent," must also be suppressed, independent of any ruling on the earlier invocation of his rights or invalid waiver.

That both "consents" were given after a lengthy international flight across multiple time zones cannot be ignored by the Court. *See* Ex. F. Any person, including Cheng's state of mind, ability to think critically and communicate clearly is diminished as a result of the fatigue of air travel and time zone changes. This undoubtedly contributed to and was taken advantage of by the agents in securing the alleged waivers.

**C.     The Evidence Must Be Suppressed Because Cheng's Rights to Due Process Were Violated**

For similar reasons, suppression is appropriate because all evidence, including statements, flowing from Cheng's custodial interrogation were obtained in violation of Cheng's right to due process. As a result of the two agents' conduct misleading Cheng, his statements and consent were not an "expression of free choice." *See Watts v. State of Ind.,* 338 U.S. 49, 53 (1949).

Cheng was told he was not under arrest although they had a warrant. The agents repeatedly implied Cheng would be free to leave afterwards if he waived his rights. The agents told Cheng that requesting a lawyer would result in him being taken to jail. They told Cheng that waiving his Constitutional rights was a "procedure" and a "formality" and "[t]his may not even be a big deal." Similar conduct has been held to violate an accused's right to due process thereby necessitating suppression.

In *United States v. Adair,* the Hon Keith Ellison, confronted with similar facts, granted a motion to suppress, holding "[i]nforming suspect immediately after arrest that exercise of his right to remain silent might result in harsher treatment renders subsequent statements by the suspect inadmissible and sufficient grounds to vacate a conviction. *United States v. Adair,* No. 4:16-cr-527 at ECF No. 51 at 4, 2018 WL322228 *2 (S. Dist. Tex. January 8, 2018)(Ellison, J.)(Citing *U. S. v. Harrison,* 34 F.3d 886 (9th Cir. 1994)). The same result is warranted here.

15

## II. Conclusion

Zhengdong Cheng requests the Court grant this motion and suppress the custodial interrogation of Cheng, including his oral and written statements, consent to search, and any evidence obtained as a result thereof. To the extent the Court determines there are any factual disputes raised by the Government's response or the evidence, Defendant requests an evidentiary hearing on this motion.

Respectfully Submitted,

**HILDER & ASSOCIATES, P.C.**

/S/ *Q. Tate Williams*
Quentin Tate Williams
Texas Bar No. 24013760
Philip H. Hilder
Texas Bar No. 09620050
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
tate@hilderlaw.com
philip@hilderlaw.com

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the foregoing instrument has been served upon the Assistant United States Attorney for the government herein, via ECF contemporaneous with filing and/or hand delivery.

                                                /S/ *Q. Tate Williams*
                                                Quentin Tate Williams

## CERTIFICATE OF CONFERENCE

       I hereby certify that on May 14, 2021, I attempt to contact both Assistant United States Attorneys handling this case by phone and email and was unsuccessful. Therefore, the motion should be treated as opposed.

                                                /S/ *Q. Tate Williams*
                                                Quentin Tate Williams