## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 4:20-CR-00455** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **ZHENGDONG CHENG** | **:** | |
| | **:** | |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE

The United States opposes defendant Cheng's Motion to Dismiss the Indictment for failure to state an offense. Cheng's Motion asserts a novel factual theory that is directly contradicted by numerous allegations in the Indictment. For this reason, and because the charged offenses are sufficiently stated in the Indictment, the Motion should be denied.

## I.    SUMMARY

As outlined in the Indictment, the defendant Zhengdong Cheng repeatedly and intentionally concealed, misrepresented, and lied about his employment with Guangdong University of Technology ("GDUT") and other activities in the People's Republic of China (PRC) for multiple years and to multiple victims. *See* Dkt. 1 (Indictment). Beginning at least as early as 2012, Cheng purposefully concealed his GDUT employment and other PRC state activities from U.S. inquirers in situations

1

where he had a duty to disclose such material information. For instance, he concealed material facts from the United States Citizenship and Immigration Services ("USCIS") when applying for citizenship;[1] he concealed material facts from his employer Texas A&M University (TAMU) when applying for full professorship; and he concealed material facts from TAMU and NASA when applying for NASA grant funding. Cheng intentionally and unlawfully concealed his GDUT employment and other PRC activities because he believed that the truth might stand in the way of his ambitions—specifically, U.S. citizenship, a full professorship, and NASA grant NNX13AQ60G (the NASA Grant).

In the case of the NASA Grant, the Indictment alleges that Cheng had an obligation to disclose material conflicts and other information to TAMU and NASA and that he failed to do so. *See id*. ¶¶ 4, 10-14. Cheng also not only knew, but was repeatedly told about, NASA's "China Funding Restriction," a statutory appropriations limitation that prohibits NASA from using funds to participate, collaborate, or coordinate bilaterally with China or any China-owned company (including PRC state universities). Cheng, likely believing that his simultaneous

---

[1] Cheng was naturalized as a U.S. citizen on or about September 12, 2013. Between approximately February 2013, when Cheng submitted his written Form N-400 Application for Naturalization, and his naturalization in September 2013, Cheng repeatedly failed to disclose his GDUT employment and taxable income from GDUT, among other material omissions, when he had a duty to disclose that information to USCIS.

GDUT employment and other PRC activities would prevent NASA from selecting a TAMU grant proposal with Cheng listed as Principal Investigator (PI), concealed and misrepresented those material facts to TAMU and NASA despite knowing he had a duty to disclose said information.

Remarkably, Cheng now argues that the precise information he concealed from TAMU and NASA is the reason the Indictment should be dismissed. Focusing on the word "bilateral" in the language of NASA's China Funding Restriction, Cheng argues that even though he intentionally concealed his GDUT employment and other PRC activities from TAMU and NASA, the fact of his undisclosed PRC collaboration rendered the NASA Grant project "multilateral" rather than "bilateral," and thus "exempt" from NASA's China Funding Restriction, so that his undisclosed PRC collaboration and other activities were permitted.[2] *See* Dkt. 69 (Defendant's Motion to Dismiss) at 1-2, 12, 18-19. Cheng then (wrongly) asserts that because his

---

[2] Cheng's Motion does not dispute the truth of his undisclosed PRC employment and other activities but instead claims that the undisclosed information is an insufficient basis for the charged offenses. However, the disputed materiality of undisclosed information is inappropriate grounds for a motion to dismiss an indictment. *See, e.g.*, *United States v. Evans*, 892 F.3d 692, 713 (5th Cir. 2018), *as revised* (July 6, 2018) ("[T]he proper inquiry is whether the allegation [in the indictment] is 'potentially capable of being proved material by the government at trial,' and whether the allegation is sufficient to support an inference of materiality.") (quoting *United States v. Bieganowski*, 313 F.3d 264, 286 (5th Cir. 2002).

3

alleged criminal conduct is "predicated entirely" on violations of NASA's China Funding Restriction, all counts of the Indictment must be dismissed.  *Id*. at 17.

Cheng's Motion is substantively and procedurally flawed.  Substantively, this case is not "predicated entirely" on violations of NASA's China Funding Restriction. Indictment allegations establish that Cheng, *regardless* of the China Funding Restriction, intentionally and fraudulently failed to disclose information that would be material to evaluating potential conflicts of interest, conflicts of commitment, and other aspects of the grant application.  Cheng's claim that the NASA Grant research was "exempt" from NASA's China Funding Restriction is also completely belied by the contemporaneous words and actions of everyone involved in the NASA Grant, Cheng included, as the Indictment allegations and case evidence demonstrate. Procedurally, a motion to dismiss for failure to state an offense is an unsuitable vehicle for Cheng to advance a new factual theory of the case.  Cheng's novel assertion that his NASA Grant project was "exempt" and thus his undisclosed PRC collaboration was "permitted" directly and unavoidably contradicts numerous allegations in the Indictment.  On a motion to dismiss, the Court must accept the Indictment allegations as true.  For these reasons, the Court must deny Cheng's Motion.

## II.    <u>LEGAL STANDARD</u>

Cheng moves to dismiss the Indictment for failure to allege [or state] an offense pursuant to Federal Rule of Criminal Procedure Rule 12(b)(3)(B)(v). "There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context." *United States v. Yakou,* 428 F.3d 241, 246-47 (D.C. Cir. 2005)   (citing   *United States v. DeLaurentis,* 230 F.3d 659, 661 (3d Cir. 2000); *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995)).   "Instead, Rule 12(b) of the Federal Rules of Criminal Procedure provides that '[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.'  The 'general issue' has been defined as 'evidence relevant to the question of guilt or innocence.'"  *Yakou*, 428 F.3d at 246-47 (quoting *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir. 1987)).   Dismissal is therefore inappropriate when the defendant's claims rely on disputed factual assertions.

"In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Thomas*, 724 F.3d 632, 640 (5th Cir. 2013) (citations omitted); *see also United States v. Kay,* 359 F.3d 738, 742 (5th Cir. 2004).  Rule 7(c)(1) dictates only that an Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the

offense charged." FED. R. CRIM. P. 7(c)(1). "The test for sufficiency is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards'; namely, that it '[(1)] contain [ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend, and [(2)], enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Kay*, 359 F.3d at 742 (quoting *United States v. Ramirez,* 233 F.3d 318, 323 (5th Cir. 2000)). The Court's review of the sufficiency of an indictment "is governed by practical, not technical considerations." *United States v. Rainey*, 757 F.3d 234, 247 (5th Cir. 2014).

## III.   <u>ARGUMENT</u>

### A.   The Indictment Conforms to Constitutional Standards and Properly States the Offenses Charged.

The Indictment charges Cheng with conspiracy (Dkt. 1; count 1; ¶¶ 54-55), wire fraud (*Id.*; counts 2-8; ¶¶ 56-58), and false statements (*Id.*; counts 9-17; ¶¶ 59-60). As alleged in the Indictment, Cheng's charged criminal conduct relates to his years-long pattern of concealment, misrepresentations, and lies to TAMU and NASA regarding his simultaneous PRC state employment and other PRC activities when he had a duty to disclose those material facts to TAMU and NASA. The Indictment thus recites the "essential facts" of the criminal conduct and the charged offenses and meets minimum constitutional standards as a sufficiently stated indictment.

6

Despite Cheng's unsupported suggestion otherwise, violations of the China Funding Restriction are *not* an element or predicate of any of the charged offenses, and the Government does not need to prove violations of the China Funding Restriction in its case against Cheng.   Nevertheless, Cheng repeats his error – treating a violation of the China Funding Restriction as though it is a predicate criminal act – throughout his Motion, referring to the Government "prosecut[ing] based on violations of the NASA's [sic] Funding Restriction," *see* Dkt. 69 at 5, arguing that "multilateral activity . . . is not subject to prosecution," *id*., and referring to "prosecution predicated on violations of NASA's China Funding Restriction." *Id*. at 17.

These arguments either misunderstand or misrepresent the charged criminal offenses and the standards for a constitutionally sufficient indictment.   NASA's China Funding Restriction is statutory appropriations language applicable to NASA, an Executive Branch agency.   The China Funding Restriction is not a criminal statute.   Cheng is not and could not be charged with violating NASA's China Funding Restriction.   For that matter, TAMU is not and could not be charged with violating NASA's China Funding Restriction.   Rather, the charges against Cheng, as listed in the Indictment, are conspiracy, wire fraud, and false statements.

NASA's China Funding Restriction is, to be sure, relevant to the case and relevant to Cheng's criminal conduct.   The China Funding Restriction is relevant, in

part, because Cheng repeatedly confirmed to TAMU and NASA that he was acting in compliance with that Restriction when he was, unbeknownst to either, a PRC state university employee.   Cheng is not himself capable of violating the statutory prohibition, but because NASA added the China Funding Restriction language to its grant requirements, Cheng's failure to disclose information that was contrary to the Restriction was material and misleading.   The China Funding Restriction also provides necessary context to explain the actions of everyone involved in the NASA Grant.   In particular, the existence of the China Funding Restriction, and most pertinently, Cheng's *knowledge of* that restriction and of NASA's careful enforcement of that restriction, help explain Cheng's motivations and his intent when concealing his PRC activities.

Violations of the China Funding Restriction are not, however, the basis of the charged offenses, nor is Cheng's criminal conduct "predicated entirely" on violations of the China Funding Restriction, as Cheng claims. *Id*. at 17.  Cheng's duties to provide truthful information and disclose material conflicts – conflicts of interest, financial conflicts, research conflicts, and conflicts of obligation – to TAMU and NASA did not arise solely or even primarily from NASA's China Funding Restriction and its incorporation into the Grant application.   As the Indictment alleges, Cheng had a duty to provide truthful information and disclose such conflicts to TAMU and NASA *independent of* NASA's China Funding

Restriction, and he failed to do so at TAMU's and NASA's expense.  For instance, the Indictment alleges that:

- "As a faculty member at TAMU, Cheng owed a duty of loyalty and candor to TAMU at all times."  Dkt. 1 ¶ 4;

- "TAMU had a policy requiring employees to disclose conflicts of interest."  *Id.* ¶ 10;

- TAMU's policies required employees engaged in research (like Cheng) to identify "all research or research activities in which the Investigator is engaged."  *Id.*;

- TAMU had an additional policy requiring the disclosure of outside employment and significant financial interests (such as paid employment at GDUT).  *Id.* ¶ 11;

- "Cheng engaged in a scheme to defraud NASA by falsely representing and concealing his affiliations with GDUT and other PRC entities to TAMU."  *Id.* ¶ 13;

- Cheng submitted "false or misleading affirmations to TAMU in the preparation of the grant application and through multiple affirmations thereafter."  *Id.*; and

- "NASA confirmed that had they known about Cheng's affiliations, they would not have awarded the Grant to TAMU with Cheng as the

9

[Principal Investigator]."  *Id*. ¶ 30.

For this reason, even if NASA's China Funding Restriction did not exist, Cheng's intentional provision of false information and his concealment of material conflicts still would have affected TAMU's and NASA's grant processes.  For example, one of the factors NASA considers when reviewing grant proposals is the applicant's level of commitment and his/her time available.  *See* Exhibit 1, 2013 NASA Guidebook for Proposers (requiring the disclosure of "[a]ll projects or activities requiring a portion of the investigators' time during the period of the proposed effort").  Cheng's deceit deprived NASA of the opportunity to *even consider* the material conflict that Cheng was simultaneously employed by a PRC state university doing the same type of scientific research when it assessed his level of commitment and chose to award NASA grant money to Cheng's team instead of another applicant.  For this same reason, if Cheng had concealed simultaneous employment with a Bulgarian or Canadian university instead of a PRC one, he still would have failed to disclose material conflicts to TAMU and NASA.

In short, this case is not about NASA's China Funding Restriction.  The alleged criminal conduct is predicated on Cheng's intentional and fraudulent nondisclosure of information that would be material to evaluating potential conflicts of interest, conflicts of commitment, and other aspects of Cheng's grant application.

10

Because the Indictment states the "essential facts" of that criminal conduct and properly states the charged offenses, the Motion should be denied.

**B.      Cheng's Novel Theory is Not a Challenge to the Sufficiency of the Indictment**

Cheng's Motion to Dismiss advances a new factual theory that the NASA Grant was, from its inception, "exempt" from NASA's "inapplicable" China Funding Restriction because it was a "multilateral" rather than "bilateral" endeavor.  *See* Dkt. 69 at 1-2, 12, 18-19.  As discussed in Section III.B.2 below, this theory is meritless and is contradicted by the contemporaneous words and actions of Cheng, Cheng's research team, NASA, and TAMU.  *Regardless* of the merit of Cheng's novel theory, however, it is distinctly *not* a challenge to the sufficiency of the Indictment and is therefore misplaced in a motion to dismiss for failure to state an offense.

Cheng correctly concedes that on a motion to dismiss an indictment for failure to state an offense, the Court is required to take the allegations of the indictment as true.  *Id*. at 3.  Cheng's Motion, however, directly relies on a factual challenge to the Indictment allegations about NASA's China Funding Restriction.  Specifically, the Indictment repeatedly alleges, both explicitly and implicitly, that the NASA Grant *was* subject to NASA's China Funding Restriction and that Cheng's undisclosed PRC collaboration was *not* permissible.  The Indictment even includes illustrative examples wherein Cheng, Cheng's team, NASA employees, and TAMU employees demonstrated their contemporaneous understanding that NASA's China Funding

Restriction applied to the NASA Grant.  The premise of Cheng's Motion – that the NASA Grant was "exempt" from NASA's "inapplicable" China Funding Restriction – is thus fatally flawed because it directly contradicts factual allegations in the Indictment.  Cheng's argument is therefore not a challenge to the legal sufficiency of the Indictment, and it is an improper basis for a motion to dismiss.  *See United States v. Kay,* 359 F.3d 738, 742 (5th Cir. 2004) (holding that allegations of the indictment must be accepted as true on a motion to dismiss).

### 1.    Numerous Factual Allegations in the Indictment Establish that the NASA Grant Was Subject to NASA's China Funding Restriction.

The Indictment *specifically* alleges that the NASA Grant was subject to NASA's China Funding Restriction.  "The Grant *was subject to* 14 C.F.R. 1260, Restrictions on Funding Activities with China." Dkt. 1 ¶ 14 (emphasis added).  The Indictment also includes numerous other allegations which establish, explicitly and implicitly, that the NASA Grant was not exempt from NASA's China Funding Restriction and that undisclosed PRC collaboration was not permissible.  Examples include, but are not limited to, the following:

- "[H]ad Cheng fully disclosed to TAMU his affiliations with GDUT and other Chinese entities, TAMU would not have certified to NASA that TAMU was in compliance with NASA's China Funding

Restriction, and NASA would not have awarded NASA-funded

projects to Cheng." *Id*. ¶ 13;

- Cheng "was aware of restrictions on the involvement of China and

  Chinese institutions in the research performed pursuant to the Grant."

  *Id*. ¶ 20;

- The Grant included a statement on "'Restrictions on Funding

  Activities with China for Awards Subject to 14 CFR 1260,' and

  provided the contents of the restriction in its entirety." *Id*. ¶ 21;

- It was "an object and result of [Cheng's] scheme to circumvent

  NASA's restrictions and receive U.S. Government funding." *Id*. ¶ 41;

- Cheng "knowingly violated NASA regulations" by collaborating with

  Chinese entities and institutions. *Id*.;

- Cheng's fraudulent conspiracy "circumvent[ed] NASA's China

  Funding Restriction." *Id*. ¶ 55; and

- Cheng caused TAMU to falsely certify to NASA its compliance with

  the China Funding Restriction. *Id*. ¶ 60.

Critically, the examples above contain factual allegations. Those factual allegations,

and all other factual allegations in the Indictment, must be accepted as true on a

motion to dismiss. Cheng's claim that he was allowed to conceal his simultaneous

PRC state employment from TAMU and NASA is a factual contradiction of the

13

allegations in the Indictment, and therefore cannot predicate a motion to dismiss. The Court should therefore reject this argument.

### 2.   Cheng's New Theory is Belied by the Contemporaneous Actions of Those Involved in the NASA Grant.

Even if this Court considers the factual merits of Cheng's motion, Cheng's novel theory lacks factual support.  Indeed, the contemporaneous words and actions of the individuals involved in the Grant from the date of the first proposal through the entirety of the Grant directly contradict Cheng's argument.  As the Indictment repeatedly alleges, Cheng, Cheng's team, TAMU employees, and NASA employees all acted in accordance with their belief that NASA's China Funding Restrictions applied to the NASA Grant and that unapproved PRC collaboration was *not* allowed.

The Indictment alleges, for instance, that "NASA regulations for the grant Cheng's team applied for" prohibited recipients from collaborating bilaterally with China or Chinese companies, *id*. ¶ 9; that TAMU submitted a form to NASA, with a copy to Cheng, titled "Assurance of Compliance - China Funding Restriction," *id*. ¶¶ 18-19; that Cheng wrote in an email to a TAMU employee that "since NASA is watching the China involvement" he wanted to disclose the possible hiring of Chinese students, *id*. ¶ 20; that Cheng "explicitly affirmed" to TAMU Compliance Officers that he had "read the language related to NASA's Funding Restriction," *id*. ¶ 23; that "TAMU officials also brought the NASA restrictions to Cheng's attention," *id*. ¶ 35; that "a TAMU compliance officer recommended that Cheng not

14

work on the Grant while in China," *id*. ¶ 36; that Cheng wrote *"No Chinese organizational collaboration" in an email to a TAMU researcher* while discussing research results, *id*. ¶ 42 (emphasis added); and that Cheng wrote in an email to a visiting scholar from China that he could not work on the Grant because the "*project is sponsored by NASA, which specifically restrict[s] collaboration with China*." *Id*. ¶ 33 (emphasis added).

All these examples directly contradict Cheng's new factual theory that he believed the NASA Grant was, from the outset, "exempt" from NASA's China Funding Restriction and that he purposefully "designed a project" which permitted his undisclosed PRC collaboration.  *See* Dkt. 69 at 2, 18.  Cheng offers no explanation for the yawning chasm between his contemporaneous words and actions related to the China Funding Restriction and his new claim – first asserted in his Motion to Dismiss – that he knew all along that the China Funding Restriction did not apply and believed his undisclosed PRC collaboration was allowed.  If, for instance, Cheng thought the project was exempt from the outset, why did he tell a Chinese professor that the "project is sponsored by NASA, which specifically restrict[s] collaboration with China"?  *Id*. ¶ 33.  Cheng does not say.  Likewise, Cheng willingly concedes that he understood TAMU's and NASA's grant procedures well enough to disclose his Spanish collaborators in the NASA Grant

proposal but avoids explaining why he did not do the same for his Chinese collaboration.

While the Court's disposition of Cheng's Motion will rightly focus on the Indictment allegations, the evidence refutes any suggestion that Cheng acted in good faith to provide full and accurate information to TAMU and NASA. For instance, TAMU email records reveal that on or about April 10, 2013 (*i.e.*, the day the NASA Grant proposal was submitted), Cheng submitted to NASA, via an online portal knows as NSPIRES, a Biographical Sketch and other required documents in support of the Grant proposal. The 2013 NASA Guidebook for Proposers explained the Biographical Sketch obligation as follows:

2.3.7 Biographical Sketch(s) . . .

**The PI (and Co-PI) must include a biographical sketch** (not to exceed two pages) **that includes his/her professional experiences and positions and a bibliography of recent publications, especially those relevant to the proposed investigation**…. [T]he biographical sketch must include a description of scientific, technical and management performance on relevant prior research efforts.

Exhibit 1 (emphasis added). As PI for the Grant, Cheng was also required to disclose any "Current and Pending Support." The 2013 NASA Guidebook for Proposers explained that obligation:

2.3.8 Current and Pending Support

**Information must be provided for all ongoing and pending projects and proposals that involve the proposing PI**.

. . . .

16

> **All current project support from whatever source** (e.g., Federal, State, local or foreign government agencies, public or private foundations, industrial or other commercial organizations) **must be listed.**
> . . . .
> **All projects or activities requiring a portion of the investigators' time during the period of the proposed effort must be included**, even if they receive no salary support from the project(s).

*Id*. (emphasis added). By any reasonable reading of those requirements, Cheng's Biographical Sketch and Current and Pending Support submissions *should* have included his current, paid employment at a foreign university in the same field of study as the sought-after grant research. Cheng instead submitted an incomplete section for "Current Support" and a Biographical Sketch with a section for "Synergistic Activities" which untruthfully and misleadingly omitted his then-current GDUT employment. *See* Exhibit 2, Cheng's TAMU NASA Grant Proposal, excerpted sections for Biographical Sketch and Current Support.

Evidence at trial will demonstrate that these were purposeful, knowing omissions for purposes of misleading TAMU and NASA, because Cheng contemporaneously maintained a separate, truthful CV he withheld from TAMU and NASA. Approximately thirteen days before submitting his incomplete disclosures to NASA, Cheng emailed a GDUT graduate student to approve his (Cheng's) accurate Chinese CV. *See* Exhibit 3, Cheng's Chinese CV Email (FBI translation). Unlike the Biographical Sketch and Current and Pending Support information he

17

provided TAMU and NASA, Cheng's contemporaneous Chinese CV disclosed, among other things, that since December of 2011, Cheng's work experience included Hundred Talents Program Special-hired Professor at GDUT [a PRC Government sponsored program], Pearl River Scholar Chair Professor of Guangdong Province, and "Person-in-charge" of GDUT Soft Matter Research Center. *Id*. Cheng's contemporaneous Chinese CV thus contained truthful, material information about his employment and professional experiences that he chose to conceal from TAMU and NASA.

Similarly, TAMU email records reflect that on or about April 4, 2013, approximately six days before the NASA Grant proposal was submitted to NASA, Cheng submitted a "Required Assurances" form to TAMU in support of the proposal. *See* Exhibit 4, Cheng's Required Assurances Transmittal.  On the form he submitted to TAMU for the Grant, Cheng untruthfully and misleadingly checked the box indicating that he had "no significant financial interest involved in the proposal" that would affect the results of the research proposed and that he would notify TAMU if that status changed at any time in the future. *Id*.  A footnote at the bottom of the form defined "Significant Financial Interests" to include "salary, royalties or other payments that when aggregated for the Investigator and the investigator's spouse and dependent children over the next twelve months, are expected to exceed $5,000." *Id*.  Cheng's "Required Assurances" form untruthfully and misleadingly

made no mention of the fact that he was a paid employee at GDUT doing work in the same field as the sought-after grant research. Here too, contemporaneous evidence indicates this was another intentional deception, as TAMU email records show that approximately two weeks before Cheng submitted his "Required Assurances" form, he had received an email from GDUT's HR Department listing his full pay for the years 2013 and 2012, which was well in excess of the $5,000 threshold (90,000 yuan (approximately $14,000 USD) each year). *See* Exhibit 5, Cheng's GDUT Salary Email (FBI translation).

Importantly, the Biographical Sketch and "Current and Pending Support" disclosures were requirements for *any* NASA grant proposal. They had *nothing to do with* the China Funding Restriction, and they were not unique to PRC conflicts. Cheng's disclosures were (1) required, (2) material, (3) knowingly made, and (4) independent of any China Funding Restriction. They were also false. Cheng's implausible claim that he intentionally designed a project to avoid the China Funding Restriction cannot, eight years later, sanctify contemporary material lies and omissions that had *nothing to do with* the China Funding Restriction. Nor can it bear the weight of contravening contemporaneous evidence.

### 3. Cheng Cannot Unilaterally Deem His Undisclosed PRC Collaboration to Be Permissible.

Cheng's Motion offers no contemporaneous evidence that anyone involved in the NASA Grant ever believed Cheng's undisclosed PRC collaboration was

19

permissible. In contrast, as established above, the Indictment repeatedly, both implicitly and explicitly, alleges that Cheng, Cheng's team, TAMU, and NASA all contemporaneously understood that NASA's China Funding Restriction applied to the NASA Grant and that Cheng's PRC collaboration was not allowed.

In addition to contravening factual allegations in the Indictment, Cheng's unilateral pronouncement that his PRC collaboration was permissible is unavailing because Cheng cannot step into the shoes of TAMU and NASA to offer his own interpretation of their required disclosures, conflicts policies, or of NASA's China Funding Restriction. The China Funding Restriction is applicable to NASA, an Executive Branch agency, and Cheng is in no position to challenge NASA's application of its rules, particularly on a Motion to Dismiss, and particularly in the face of contemporaneous contravening evidence. Cheng does not even allege that the Spanish researchers or GDUT were signatories to the Grant, received Grant funding, or owed any contractual obligations to NASA. Furthermore, the China Funding Restriction broadly applies to bilateral collaboration "in any way" with the PRC or PRC institutions; its reach is not limited to the enumerated parties to a grant contract. The mere existence of a larger "multilateral" project does not mean that every related activity is also definitionally "multilateral" — NASA must look to the specific activity being conducted with NASA funds to determine whether particular

20

activity is "bilateral."[3]   As an example, NASA employees regularly participate in international conferences which are unambiguously "multilateral" events, but those NASA employees are not thereby rendered "exempt" from the "inapplicable" China Funding Restriction such that they could conduct bilateral collaborations with Chinese state scientists while attending the conference.  Whether a given activity is "bilateral" collaboration is an inescapably factual determination, and that determination is not for Cheng to make—or for the Court in ruling on a motion to dismiss.

_____

[3] This point also applies to two additional/alternative arguments briefly raised in Cheng's Motion.  Cheng asserts this his PRC collaboration was permissible for the additional reasons that: (1) in 2016, three years into performance of the NASA Grant, Cheng apparently considered collaborating with Russian scientists; and (2) the NASA Grant research was intended to benefit the International Space Station (ISS), which Cheng asserts is a "multilateral" project.  *See* Dkt. 69 at 1, 9-10, 15-16.

As a preliminary matter, these claims, too, are misplaced in a motion to dismiss because they do not attack the sufficiency of the Indictment.  Cheng's Motion makes this patently obvious by relying on citations to disputed evidence from outside of the Indictment.  *Id*.  Additionally, Cheng's argument about Russian researchers ignores the fact that 2016 was *three years* into the performance of the Grant.  Cheng also offers, at best, only an unsigned memo and a 2016 presentation to an unrelated university (*i.e.*, disputed evidence from outside of the Indictment) in support of the claim.  Citing Cheng's own words, Cheng's argument about the ISS appears to falsely imply that Cheng's team conducted scientific experiments "on" the ISS.  *Id*. at 9.  This is false.  The evidence does not show that Cheng's research was ever incorporated "on" the ISS.  If what Cheng intended to argue is that the NASA Grant research was "multilateral" because the ISS is itself a "multilateral" project and Cheng's research *might one day have been* incorporated on the ISS, then it reaches a level of abstraction that renders the China Funding Restriction meaningless.

Moreover, given that NASA's China Funding Restriction represents a check imposed by the Legislative Branch on an Executive Branch agency (NASA), it is unclear that the question of whether a particular PRC collaboration was permissible under the China Funding Restriction is even a justiciable matter for the courts to decide on a motion to dismiss, let alone for Cheng.  The Indictment explicitly alleges that the NASA Grant was "subject to" NASA's China Funding Restriction.  Dkt. 1 ¶ 14.  To the extent Cheng can even challenge NASA's application of a Legislative Branch check on its funding, this is a disputed question which would need to be resolved by an ultimate factfinder, not on a motion to dismiss.  *See United States v. Kay,* 359 F.3d 738, 742 (5th Cir. 2004) (holding that allegations of the indictment must be accepted as true on a motion to dismiss).

## IV.   <u>CONCLUSION</u>

The test for the sufficiency of an Indictment is "'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards.'" *United States v. Kay,* 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Ramirez,* 233 F.3d 318, 323 (5th Cir. 2000)). For the reasons discussed above, the Indictment is constitutionally sufficient and Cheng's Motion should be denied.

Respectfully submitted,


**JENNIFER B. LOWERY**
Acting United States Attorney

/s/ *Carolyn Ferko*
Carolyn Ferko
Assistant United States Attorney
Southern District of Texas


**Matthew G. Olson**
Assistant Attorney General


/s/ *Adam Hess*
Adam Hess
Trial Attorney
U.S. Department of Justice
National Security Division
Counterintelligence & Export Control
Section

## **CERTIFICATE OF SERVICE**

I certify that the United States' Response to Defendant's Motion to Dismiss was served on counsel for the defendant via e-mail on November 23, 2021.

/s/  *Carolyn Ferko*
Carolyn Ferko
Assistant United States Attorney
Southern District of Texas